2002 OK CR 32

**Patrick Dwayne MURPHY, Petitioner,**

v.

**The STATE of Oklahoma, Respondent.**

No. PCD–2001–1197.

Court of Criminal Appeals of Oklahoma.

Sept. 4, 2002.

**560**

Bryan Lester Dupler, Oklahoma Indigent Defense System, Norman, Oklahoma, for Petitioner.

### OPINION DENYING APPLICATION FOR POST–CONVICTION RELIEF AND GRANTING EVIDENTIARY HEARING

LUMPKIN, Presiding Judge.

¶ 1 Petitioner Patrick Dwayne Murphy was convicted of First Degree Murder in the District Court of McIntosh County, Case Number CF–1999–164A, and sentenced to death. He appealed his conviction to this Court in Case No. D–2000–705. We affirmed Petitioner's conviction and sentence. *Murphy v. State*, 2002 OK CR 24, 47 P.3d 876. Petitioner filed his Application for Post–Conviction Relief on February 7, 2002, pursuant to 22 O.S.2001, § 1089. Accompanying that application is Petitioner's motion for evidentiary hearing, filed pursuant to Rule 9.7(D), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2002).

¶ 2 On numerous occasions, this Court has set forth the narrow scope of review available under the amended Post–Conviction Procedure Act. *See e.g., McCarty v. State*, 1999 OK CR 24, ¶ 4, 989 P.2d 990, 993, *cert. denied*, 528 U.S. 1009, 120 S.Ct. 509, 145 L.Ed.2d 394 (1999). The Post–Conviction Procedure Act was neither designed nor intended to provide applicants another direct appeal. *Walker v. State*, 1997 OK CR 3, ¶ 3, 933 P.2d 327, 330, *cert. denied*, 521 U.S. 1125, 117 S.Ct. 2524, 138 L.Ed.2d 1024 (interpreting Act as amended). The Act has always provided petitioners with very limited grounds upon which to base a collateral attack on their judgments. Accordingly, claims that could have been raised in previous appeals but were not are generally waived; claims raised and addressed on direct appeal are barred by the doctrine of *res judicata*. *Thomas v. State*, 1994 OK CR 85, ¶ 3, 888 P.2d 522, 525 (Okl.Cr.1994), *cert. denied*, 516 U.S. 840, 116 S.Ct. 123, 133 L.Ed.2d 73 (1995).

¶ 3 The new Act makes it even more difficult for capital post-conviction applicants to avoid procedural bars. *Walker*, 1997 OK CR 3, ¶ 4, 933 P.2d at 331. Under 22 O.S.2001, § 1089(C)(1), only claims that "[w]ere not and could not have been raised" on direct appeal will be considered. *Id.* A capital post-conviction claim could not have been raised on direct appeal if: (1) it is an ineffective assistance of trial or appellate counsel claim which meets the statute's definition of ineffective counsel; or (2) the legal basis of the claim was not recognized or could not have been reasonably formulated from a decision of the United States Su-

preme Court, a federal appellate court or an appellate court of this State, or is a new rule of constitutional law given retroactive effect by the Supreme Court or an appellate court of this State. 22 O.S.2001, §§ 1089(D)(4)(b), 1089(D)(9).

¶ 4 Should a petitioner meet this burden, this Court shall consider the claim only if it "[s]upports a conclusion either that the outcome of the trial would have been different but for the errors or that the defendant is factually innocent." 22 O.S.2001, § 1089(C)(2). As we said in *Walker*,

> The amendments to the capital post-conviction review statute reflect the legislature's intent to honor and preserve the legal principle of finality of judgment, and we will narrowly construe these amendments to effectuate that intent. Given the newly refined and limited review afforded capital post-conviction applicants, we must also emphasize the importance of direct appeal as the mechanism for raising all potentially meritorious claims. Because the direct appeal provides appellants their only opportunity to have this Court fully review *all* claims of error which might arguably warrant relief, we urge them to raise all such claims at that juncture.

*Walker*, 1997 OK CR 3, ¶ 5, 933 P.2d at 331 (footnote omitted, emphasis in original). We now turn to Petitioner's claims.

¶ 5 In propositions one and four, Petitioner claims his trial and appellate counsel failed to adequately investigate, develop, and present available mitigating evidence of Petitioner's deprived background, mental retardation, exposure to alcohol and violence at a young age, neuropsychological impairments, and other mitigating evidence through available witnesses, thus denying him effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article 2, Sections 7

and 20 of Oklahoma's Constitution. He requests an evidentiary hearing to fully develop the mitigating evidence and to demonstrate prejudice arising from his prior counsels' deficient performances, which allegedly denied him a fair sentencing proceeding under the Eighth Amendment to the United States Constitution and Article 2, Section 9 of Oklahoma's Constitution. He also alleges violations of the Fifth Amendment to the United States Constitution and to Article II, Section 6 of Oklahoma's Constitution.

¶ 6 Petitioner claims his trial counsel should have known a murder conviction was likely, given the fact that three witnesses were scheduled to testify regarding his involvement. Thus, he claims his trial counsel "should have known that a compelling mitigation case in the sentencing phase would be the only reasonable strategy for avoiding the ultimate penalty."

¶ 7 While conceding his counsel presented mitigating evidence through various trial witnesses, Petitioner claims the evidence was "incomplete, disjointed, and failed to emphasize several substantive factors that weighed against the imposition of death." He claims his attorneys reduced him "almost to a clinical instrumentality instead of revealing the wealth of mitigating circumstances that were readily available for the jury's consideration." [1]

¶ 8 Furthermore, based upon Dr. John R. Smith's affidavit, Petitioner claims his trial and appellate lawyers were ineffective for failing to discover and present evidence of a "significant neurological dysfunction ... caused by his mother's ingestion of copious amounts of alcohol during pregnancy."

¶ 9 Petitioner claims his case is similar to *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). There, the

---

1. Petitioner specifically claims: his trial counsel spent less than one hour in out-of-court meetings with him from the time of his arrest until the conclusion of trial; he was informed he would testify in the guilt-innocence stage on the day he took the stand; his trial counsel did not prepare him to testify for either stage of trial; during his penalty stage testimony, counsel failed to ask questions regarding his childhood neglect, poverty, friendships, or employment history; people

familiar with his childhood, such as coaches and classmates, were not called as witnesses, although they had good opinions of him; family members who could have explained his dysfunctional and violent family life were not called; and evidence of fetal alcohol exposure was not presented at trial, thus depriving Petitioner's experts from studying the possibility that this contributed to his neurological and physical development in a detrimental way.

**562**

United States Supreme Court found defendant Williams's trial lawyers failed to investigate and present substantial mitigating evidence to his sentencing jury, thus violating the defendant's right to effective assistance of counsel as defined in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

¶ 10 In so finding, the Supreme Court noted several pertinent matters relating to the assistance provided by the defendant's trial attorneys. They did not begin preparing for the sentencing stage of the defendant's capital trial until a week before trial. They failed to conduct an investigation that would have uncovered extensive records graphically describing Williams's "nightmarish childhood," which included evidence of repeated beatings and criminal neglect the defendant suffered at the hands of his parents. These records were apparently social service documents to which the attorneys wrongly believed they did not have access.[2] Furthermore, counsel failed to introduce the following available evidence: Williams was borderline mentally retarded and did not get past sixth grade; he had been a good, peaceful prisoner who had been helpful in cracking a prison drug ring; he had earned a carpentry degree while in prison; and he seemed to thrive in the structured prison environment. In granting the defendant a new sentencing proceeding, the Supreme Court placed importance on the fact that the defendant had turned himself in on the crime, expressed remorse for his actions, and cooperated with the police investigations.

■ ¶ 11 The question presented, therefore, is whether the holding in *Williams* applies equally to this case, i.e., whether Petitioner's trial and appellate counsel rendered effective assistance under *Strickland* and *Williams* with respect to the second stage proceedings. To answer this question, we must review the mitigating evidence presented in Petitioner's trial, compare it to the mitigation evidence presented in the post-conviction record, and decide if the post-conviction evidence raises "a reasonable probability that the result of the sentencing proceeding would have been different" if competent counsel had presented and explained the significance of all the available evidence. *Williams*, 529 U.S. at 399, 120 S.Ct. at 1516.

¶ 12 A thorough review of the trial record reveals the following mitigating, or at least arguably mitigating, evidence was admitted during the first stage of Petitioner's trial: Petitioner claimed he participated in the beating but did not actually kill the victim or amputate the victim's genitalia; Petitioner was extremely drunk[3] when the murder was committed; Petitioner testified he drank at least thirty-two beers and told police he was "three sheets to the wind"; the incident arose out of a long-standing domestic situation, i.e., Petitioner's hatred for the victim due in some part to the victim's relationship with Petitioner's so-called "common-law" wife;[4] during the incident, Petitioner prevented his accomplices from beating Mark Sumka further; Mark Taylor testified Petitioner is not a violent person, does not go looking for fights, and had once blacked out from drinking; Petitioner has a history of alcoholism in his family; he first tasted alcohol at the age of eleven or twelve and drank regularly through his teen years; he became a daily drinker at the age of eighteen or so; he had as many as five arrests relating to public intoxication in his past; he has a good work record; he drank heavily-by his own account he drank in excess of thirty beers a day on weekends and twelve to thirty beers on a normal weekday;[5] as a result of his drinking, he frequently experienced tempo-

---

2. The Court noted those records also included some information that was detrimental to the defendant's mitigation efforts, including several criminal convictions while he was a juvenile.

3. Mark Taylor testified Petitioner consumed many beers on the day in question, at least nineteen by the most conservative count.

4. Mark Sumka testified that, during the incident, Petitioner said he was going to do to the victim

what "they" had done to him. Furthermore, Patsy Jacobs testified about arguments she had with Petitioner before the crime concerning her relationship with the victim.

5. Petitioner told one expert he drank as many as three to five "thirty packs" a day on some weekends.

rary loss of memory; he is alcohol-dependent, an alcoholic; he exhibits poor impulse control, even when not drinking, but much worse when he has been drinking; one expert testified there was "no doubt" Petitioner has some degree of brain damage [6] because of his alcohol-dependency and possibly due to accidents he had over the years; Petitioner was diagnosed with adult attention deficit hyperactivity disorder; and he has "borderline mental capacity," although he did finish high school and attended college courses.

¶ 13 In the second stage proceedings, the following mitigating, or at least arguably mitigating, evidence was introduced: Petitioner scored an eight on a test designed to detect whether or not a person is a psychopath (predator), with a score of thirty indicating a person is in fact a psychopath; Petitioner's score on the psychopath test is considered low in comparison to other criminals, indicating he is a very low risk for future violence in a prison setting, where alcohol is not available; a risk assessment evaluation given to Petitioner also concluded he is a low risk for future violence in a prison setting; Petitioner has a very strong employment history, i.e., he has been an "excellent" employee with few attendance problems; Petitioner's jailers had had no problem with him during the eight months before trial-he was a good prisoner; he did well in school and was described as a "quiet" and "good kid" in his youth; when testing his intelligence, he was initially estimated to be in the low average intelligence range, but actually scored a 67, which is in the mildly mentally retarded range, on the abbreviated form of the Wechsler Adult Intelligence Test; Petitioner's school records from twenty years earlier indicated he was "educable mentally handicapped," which is equivalent to being mildly mentally retarded; [7] he is in need of neurological testing, for he will have some amount of brain damage due to excessive drinking; he has major deficits in impulse control associated with hyperactivity; he had three head injuries in his past (car accident where his head went through a windshield, an accidental whack in the head by an ax, and a fall from a porch at the age of five) that may have affected his neurological development; Petitioner's father was not there for him when he was a young child; his father is "probably" an alcoholic and his mother's drinking was described as "problem related consumption;" he and his four siblings were basically raised by their mother alone; Petitioner was often called "nigger" when he was growing up (he is half Native American and half African American); some of his own relatives treated him poorly, calling him names; there were frequent fights in his family when he grew up; Petitioner was a hard worker in his youth, because the family had to work hard to make ends meet; Petitioner and Patsy Jacobs frequently drank hard and their marriage was prone to domestic violence; his personality seemed to change after he was in a truck wreck; Petitioner took the stand and acknowledge having a part in the crime and apologized to the victim's family; he graduated from high school with a 3.0 grade point average and had a 2.9 grade point average for the classes he took in college; he had earned certificates of some sort while in prison; he loves his children and desires to take care of them; and he would benefit from alcohol treatment and long-term therapy.

¶ 14 In addition, a jury instruction told jurors to consider the following mitigating evidence that had been presented at trial: the defendant did not have any significant history of prior criminal activity; the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired by alcohol; the defendant was under the influence of emotional disturbance by virtue of his alcohol dependency; the defendant acted un-

---

**6.** At another point in the trial, this same expert said brain damage was a "very good possibility," based upon tests he administered that indicated soft signs of neurological damage. But later, during the second stage proceedings, the same expert testified that "the extent that he's consumed alcohol and for the number of years that he has done so he's going to have some degree of brain damage. What, I don't know. Okay? But when you're drinking and when you use you destroy brain cells. He's going to have some deficit there from that."

**7.** An expert testified Petitioner's score may have been affected by cultural concerns, his impulsivity, and the testing conditions.

der circumstances which tended to reduce the crime in that he was under the influence of alcohol; the defendant is likely to be rehabilitated; cooperation by the defendant with authorities; the defendant's age; the defendant's character; the defendant's emotional/family history; the defendant suffers from mild mental retardation.

¶ 15 To support his claim that the mitigating evidence presented in his trial amounted to ineffective assistance of counsel in comparison to what could have been presented, Petitioner has submitted various affidavits and evidentiary materials for this Court's review. Pursuant to Rule 9.7(D)(1)(a), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2002), affidavits and evidentiary materials filed in support of a post-conviction application are not part of the trial record but are only part of the capital post-conviction record. As such, those affidavits and evidentiary materials are not reviewed on their merits but are reviewed:

> [T]o determine if a threshold showing is met to require a review on the merits. If this Court determines that the requirements of Section 1089(D) of Title 22 have been met and issues of fact must be resolved by the District Court, it shall issue an order remanding to the District Court for a hearing on the merits of the claim raised in the application.

Furthermore, post-conviction petitioners seeking a review of their post-conviction affidavits are required to file an application for evidentiary hearing. Rule 9.7(D)(5), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2002). The application for evidentiary hearing and affidavits "must contain sufficient information to show this Court by clear and convincing evidence the materials sought to be introduced have or are likely to have support in law and fact to be relevant to an allegation raised in the application for post-conviction relief." *Id.* If this Court determines "the requirements of Section 1089(D) of Title 22 have been met and issues of fact must be resolved by the district court, it shall issue an order remanding to the district court for an evidentiary

hearing." Rule 9.7(D)(6), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2002). We will review the affidavits attached to Powell's post-conviction materials in this light.

¶ 16 Here, we find these affidavits and evidentiary materials do not contain sufficient information to show this Court by clear and convincing evidence that the materials sought to be introduced have or are likely to have support in law and fact to be relevant to Petitioner's ineffective assistance claims, i.e., that in the presentation of mitigating evidence counsel "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" or that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

¶ 17 The post-conviction affidavits establish more "mitigating" evidence than was developed at trial. They establish Petitioner grew up in a rough and dangerous neighborhood, and he was underprivileged and often neglected as a child. A lot of violence occurred at Petitioner's home, including a stabbing and assault with a gun, but it is unclear to what extent Petitioner witnessed these events. Petitioner's father was a violent man, who used violence against Petitioner and his brother in the past. Petitioner was well liked by many in the community and was described as quiet and well behaved in his youth.

¶ 18 However, the post-conviction affidavits and evidentiary materials do not demonstrate a failure by Petitioner's trial counsel to present mitigating evidence of a constitutionally deficient magnitude, as that in *Williams.* As reflected above, jurors were told a great deal about Petitioner's life. The post-conviction affidavits and evidentiary materials certainly tell us more, but that will almost always be the case when you view a trial in hindsight.

¶ 19 Moreover, the post-conviction affidavits and evidentiary materials often conflict with each other or with testimony given by

Petitioner or others at trial.[8] Several of the affidavits include unreliable hearsay references. Some of the information is irrelevant, and some of it is as aggravating as it is mitigating.

¶ 20 Viewing the affidavits and evidentiary materials submitted on post-conviction as a whole, we cannot say, in accordance with *Williams*, that there was "a reasonable probability that the result of the sentencing proceeding would have been different" if competent counsel had presented the materials and explained their significance. In our opinion, Petitioner's trial and appellate counsels' performances did not constitute the denial of reasonably competent assistance of counsel under prevailing professional norms. *See Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066 ("court must ... determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance"); 22 O.S.2001, § 1089(D)(4)(b)(2); *Walker*, 1997 OK CR 3, ¶ 11, 933 P.2d at 333, n. 25. We find proposition one and four are without merit. Thus, Petitioner's request for an evidentiary hearing on his claims of ineffective assistance of counsel is hereby **DENIED.**

¶ 21 In proposition two, Petitioner claims his state and federal constitutional rights to jury trial were violated by the failure to instruct the jury that it must find the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. He claims that "because the weighing determination is a factual determination which authorizes the sentencer to increase punishment for murder above the statutory maximum, the Oklahoma Constitution and the Sixth and Fourteenth Amendments to the federal constitution require that this determination be made by a jury and must be proved beyond a reasonable doubt." Because this claim was not raised at trial or on appeal, he claims his trial and appellate counsel were ineffective.

■ ¶ 22 Petitioner specifically attacks OUJI–CR 2d 4–76[9] and OUJI–CR 2d 4–80[10] and claims they violate the United States Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). There, the United States Supreme Court found, in a non-capital case, that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statuto-

8. For example, the affidavits and evidentiary materials are inconsistent regarding the amount of drinking accomplished by Elizabeth Murphy during her pregnancy with Petitioner. Elizabeth described a time, apparently before the pregnancy, when she drank 24 cans of beer. During the pregnancy, however, she claimed that she only drank two cans of beer on many evenings to help her relax. Elizabeth's sister portrayed Elizabeth as an alcoholic who drank to excess during her pregnancy and who had used excessive amounts of alcohol to induce abortions (but at times after her pregnancy with Petitioner). James Bowen (Petitioner's trial counsel) claimed Ms. Murphy always maintained, during pre-trial interviews, that her alcohol consumption was minimal during her pregnancy. He also claimed her family members never contradicted this assertion. Furthermore, Bowen spoke with Dr. Jeanne Russell prior to trial, and they discussed the "absence of any visible characteristics of Fetal Alcohol Syndrome." Based, apparently, upon this contradictory evidence and nothing more, John R. Smith, psychiatrist and neurologist hired for purposes of the post-conviction proceedings, concluded that Petitioner has a "severe brain disorder which was never clearly identified at his trial. That impairment is Fetal Alcohol Syndrome/Fetal Alcohol Effect Syndrome."

9. "Aggravating circumstances are those which increase the guilt or enormity of the offense. In determining which sentence you may impose in this case, you may consider only those aggravating circumstances set forth in these instructions. Should you unanimously find that one or more aggravating circumstances existed beyond a reasonable doubt, you are authorized to consider imposing a sentence of death. If you do not unanimously find beyond a reasonable doubt that one or more of the aggravating circumstances existed, you are prohibited from considering the penalty of death. In that event, the sentence must be imprisonment for life without the possibility of parole or imprisonment for life with the possibility of parole."

10. "If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, the death penalty shall not be imposed unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances. Even if you find that the aggravating circumstances outweigh the mitigating circumstances, you may impose a sentence of imprisonment for life with the possibility of parole or imprisonment for life without the possibility of parole."

ry maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2362–63. Petitioner argues that this holding, as applied to our jury instructions, requires that a jury find that statutory aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt before it may impose the death penalty.

¶ 23 On numerous occasions, prior to *Apprendi*, when criminal defendants have presented similar arguments to the one Petitioner raises here, this Court has stated its firm position that "specific standards for balancing aggravating and mitigating circumstances are not required" under Oklahoma's capital sentencing scheme. *See e.g., Patton v. State*, 1998 OK CR 66, 973 P.2d 270, 299; *Richie v. State*, 1995 OK CR 67, 908 P.2d 268, 279; *Powell v. State*, 1995 OK CR 37, 906 P.2d 765, 783. Our position on this point has not changed as a result of the *Apprendi* decision, for the reasons set forth below.

■ ¶ 24 First, *Apprendi* was a five to four, non-capital decision that resulted in five separate opinions from the Supreme Court justices on distinguishable facts. Second, *Apprendi's* language does not, in our opinion, extend so broadly as to require a jury to find aggravating circumstances, which have already been found by that jury to exist beyond a reasonable doubt, outweighed the mitigating circumstances beyond a reasonable doubt. Third, the United States Supreme Court's recent decision in *Ring v. Arizona*, — U.S. ——, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), while apparently extending *Apprendi's* holding to capital sentencing schemes, sheds no further light on the precise issue here.[11] Fourth, under Oklahoma's capital sentencing scheme, jurors are required to unanimously find statutory aggravating circumstances exist beyond a reasonable doubt, before the death penalty can be considered. At that point, the death penalty is in fact the maximum penalty, and the jury is simply deciding which of the three available punishments is proper, so long as aggravating circumstances outweigh mitigating circumstances.

¶ 25 We thus reject the notion that *Apprendi* forms a basis for invalidating Oklahoma's capital sentencing scheme. We also find Petitioner's trial and appellate counsel were not ineffective for failing to previously raise this issue.

■ ¶ 26 In proposition three, Petitioner claims, due to his mild mental retardation, his execution would violate the state and federal constitutional prohibitions against cruel and/or unusual punishments and would offend contemporary standards of decency. He asks this Court to consider recent legislative and judicial action and other "indicia of current public sentiment" in resolving this claim. He also asks us to hold his postconviction proceeding in abeyance pending the United States Supreme Court's decision in *Atkins v. Virginia*.[12]

■ ¶ 27 Petitioner did not raise this claim on direct appeal, although he obviously had the opportunity to do so, and he does not raise the issue here in relation to an ineffective assistance claim. Under normal circumstances, this would be absolutely fatal to his claim under the post-conviction act. However, due to a recent flurry of legislative,[13] executive,[14] and judicial activity concerning this precise issue, including the United States Supreme Court's opinion in *Atkins*, we will address this issue in order to give

11. *See also Burch v. Corcoran*, 273 F.3d 577, 584 n. 6 (4th Cir.2001)(noting the sentencing jury "was simply selecting the appropriate sentence from a range of penalties that already included the death penalty.")

12. *Atkins* was decided by the Supreme Court on June 20, 2002, prior to this decision being handed down. *See Atkins*, —— U.S. ——, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

13. Late in the 2002 legislative session, Oklahoma's legislature passed House Bill 2635,

which would have limited the execution of mentally retarded persons under certain conditions. The standards for adjudging mental retardation in House Bill 2635 are notably consistent with standards used by the American Association of Mental Retardation (AAMR) and the American Psychiatric Association (APA), as reflected in footnotes three and five of the *Atkins* opinion.

14. Oklahoma Governor Frank Keating vetoed House Bill 2635 on June 7, 2002.

guidance to the various district court judges, attorneys, and death row inmates who may be affected by what appears to be a new rule of constitutional law.

¶ 28 As the law in this state currently stands, "[a]ll persons are capable of committing crimes," except those in certain statutorily defined classes, including "persons who are impaired by reason of mental retardation upon proof that at the time of committing the act charged against them they were incapable of knowing its wrongfulness" and "[p]ersons who committed the act, or made the omission charged, under an ignorance or mistake of fact which disproves any criminal intent." 21 O.S.2001, § 152. And yet, while mentally retarded individuals are capable of committing crimes in Oklahoma, in light of *Atkins,* those who fit within its holding are no longer eligible for the death penalty.[15]

¶ 29 *Atkins* notes, however, that there is serious disagreement (and thus no "national consensus" [16]) among the States in determining which offenders are in fact retarded: "Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about who there is a national consensus." [17] *Atkins,* —— U.S. at ——, 122 S.Ct. at 2250. It is therefore important to understand that *Atkins* does not attempt to define who is or who is not mentally retarded for purposes of eligibility for a death sentence, but "leave[s]

to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." *Id.*

¶ 30 That puts this State in an interesting position, considering our legislature has attempted to do just that, but our Governor has apparently disagreed with the legislature's efforts. Thus, the task falls upon this Court to develop standards to guide those affected until the other branches of government can reach a meeting of the minds on this issue.

¶ 31 According, we hereby adopt the following definition for mental retardation that will apply to individuals alleging they are not eligible to be sentenced to the death penalty, for use in capital trials: [18]

A person is "mentally retarded": (1) If he or she functions at a significantly subaverage intellectual level that substantially limits his or her ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others; (2) The mental retardation manifested itself before the age of eighteen (18) [19]; and (3) The mental retardation is accompanied by significant limitations in adaptive functioning in at least two of the

**15.** According to *Atkins,* "death is not a suitable punishment for a mentally retarded criminal ... Construing and applying the Eighth Amendment in the light of our 'evolving standards of decency,' we therefore conclude that such punishment is excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." *Atkins,* —— U.S. at ——, 122 S.Ct at 2252.

**16.** While I do not believe the law should be interpreted by opinion polls, I defer to the United States Supreme Court's terminology.

**17.** Murphy's alleged "mild mental retardation" is, arguably, one of those borderline cases upon which reasonable minds could disagree. His retardation-which was somewhat downplayed by his own expert as being possibly due to testing conditions, cultural factors, and Petitioner's socialization-was submitted to a jury for purposes of mitigation, but the jury decided to impose the death penalty. Murphy's expert had expected he would fall into a borderline range and was sur-

prised by the test results. Murphy did reasonably well in school, although some of his school records indicated he was "educable mentally handicapped," a term his expert likened to the phrase "mild mental retardation."

**18.** Our use of the terms mentally retarded and mental retardation is limited to cases where a person claims he or she is mentally retarded to the extent to be ineligible for the death penalty.

**19.** "Manifestation before the age of eighteen" is a fact question intended to establish that the first signs of mental retardation appeared and were recognized before the defendant turned eighteen. Lay opinion and poor school records may be considered. Thus, a defendant need not, necessarily, introduce an intelligent quotient test administered before the age of eighteen or a medical opinion given before the age of eighteen in order to prove his or her mental retardation manifested before the age of eighteen, although such proof would surely be the more credible of that fact.

following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work.

It is the defendant's burden to prove he or she is mentally retarded by a preponderance of the evidence[20] at trial. Intelligence quotients are one of the many factors that may be considered, but are not alone determinative. However, no person shall be eligible to be considered mentally retarded unless he or she has an intelligence quotient of seventy or below, as reflected by at least one scientifically recognized, scientifically approved, and contemporary[21] intelligent quotient test.

This standard shall be used at all future and pending capital trials, until such time as it may be replaced by a suitable legislative enactment.

¶ 32 Unless the issue of mental retardation is resolved prior to trial, the issue of mental retardation shall be decided in the sentencing stage of a capital murder trial, pursuant to the instruction set forth in Appendix "A." Furthermore, in all future capital trials where the defendant intends to use the issue of mental retardation to avoid the death penalty, the defendant shall give written notice of that fact by filing a notice in the record (and copied to counsel for the State) no less than forty-five (45) days prior to trial. The Oklahoma Criminal Discovery Code, 22 O.S.2001, § 2001 *et seq.*, shall be applicable to any evidence relating to the issue of mental retardation.

¶ 33 If the jury determines a defendant is mentally retarded, as defined within this opinion, that defendant shall no longer be eligible for the death penalty. However, if the jury finds the defendant has not proven he or she is mentally retarded by a preponderance of the evidence, the defendant's intellectual functioning may still be considered as a mitigating factor in the sentencing stage.

¶ 34 In those cases where (1) a defendant has properly raised the issue of mental retardation, as set forth above, (2) the jury finds the defendant is not mentally retarded, as defined in this opinion, and (3) the jury then imposes the death penalty, the trial court shall, upon request of the defendant,[22] hold a post-judgment *Atkins* hearing for the purpose of determining if the jury's decision on the issue of mental retardation has resulted in an excessive sentence,[23] i.e., a sentence

20. We adopt a preponderance of the evidence standard here in spite of the "clear and convincing" standard adopted by our Legislature in House Bill 2635, which was patterned after North Carolina's statute. In so doing, we recognize other states that have adopted statutory procedures relating to the proof of mental retardation are split on the burden of proof, i.e., approximately five states utilize a clear and convincing standard while approximately eleven states use preponderance of the evidence. To date, the United States Supreme Court has not mandated a particular standard, but has left the task to the individual states to develop appropriate ways to address the issue. While I would have followed our Legislature's stated intent, the Court, as a whole, has opted for a preponderance of the evidence standard.

21. By contemporary, we mean the intelligent quotient test registering seventy or below was administered some time after the capital crime was committed or is one that may be understood by contemporary standards.

22. The defendant's request for an *Atkins* hearing shall be made in writing, filed of record, and submitted to the trial judge within ten (10) days of the jury verdict and prior to formal sentenc-

ing. The hearing thereon shall be held on the date set for sentencing but prior to formal sentencing. No additional evidence from that entered into the trial record may be used, but the parties shall be allowed to make oral arguments from such trial evidence.

23. Sentencing in a first-degree murder case is governed by 21 O.S.2001, § 701.10 and sentencing on remand of a capital murder trial is governed by 21 O.S.2001, § 701.10a. However, this Court has ultimate authority to review death penalty sentences, pursuant to 21 O.S.2001, § 701.13, which includes a report from the trial judge. The *Atkins* hearing is an extension of that trial judge's report. Along that line, 22 O.S.2001, § 926.1 provides: "In all cases of a verdict of conviction for any offense against any of the laws of the State of Oklahoma, the jury may, and shall upon the request of the defendant assess and declare the punishment in their verdict within the limitations fixed by law, and the court shall render a judgment according to such verdict, except as hereinafter provided." However, 22 O.S.2001, § 928.1 allows the trial court to "disregard" a sentence that is greater than the highest limit declared by law for the offense and "render judgment according to the highest limit

that imposed the death penalty upon a defendant who is mentally retarded, as herein defined.

¶ 35 The trial judge's duty at an *Atkins* hearing is to determine whether or not the factual determinations relating to the issue of mental retardation were imposed by the jury under the influence of passion, prejudice, or any other arbitrary factor.[24] In administering this duty, the trial judge shall conduct his or her own *de novo* review[25] of the evidence presented at trial and determine whether or not the defendant is mentally retarded, as herein defined, using a preponderance of the evidence standard. The trial judge shall make written findings and conclusions upon whether or not the defendant is mentally retarded, using the definition above, and file those written findings and conclusions in the record within fifteen (15) days of the hearing, as an exhibit to the trial judges report. Where a trial judge determines that a defendant is mentally retarded and, consequently, that the jury's decision finding the defendant not mentally retarded was due to the influence of passion, prejudice, or other arbitrary factor, that issue may be raised as a proposition of error for this Court to consider as part of its mandatory sentence review.

¶ 36 For pending capital appeals and inmates who may file applications for post-conviction relief to address this issue, the issue of mental retardation is preserved in the following circumstances: in those cases where evidence of the defendant's mental retardation was introduced at trial and/or the defendant either (1) received an instruction that his or her mental retardation was a mitigating factor for the jury to consider, (2) appealed his death sentence and therein raised the claim that the execution of the mentally retarded was cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution (or a substantially similar claim relating to his or her mental retardation), or (3) raised a claim of ineffective assistance of counsel, on appeal or in a previous post-conviction application, in which he or she asserted trial counsel or appellate counsel failed to raise the claim that the execution of the mentally retarded was cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution. In such cases, the defendant's counsel shall file either an application for post-conviction relief, if the defendant's case is not pending in this Court, or an application with this Court in a pending appeal seeking a remand to the appropriate District Court for an evidentiary hearing to determine whether or not sufficient evidence of the defendant's mental retardation exists in order for the matter to be remanded for resentencing, as ordered below.[26]

### DECISION

¶ 37 After carefully reviewing Petitioner's Application for Post–Conviction Relief, Motion for Evidentiary Hearing and Motion to Hold Post–Conviction Case in Abeyance, we

---

prescribed by law in the particular case." While section 928.1 speaks of "punishment, whether of imprisonment or fine" and thus does not apply to capital trials, the same concept should apply to the purely factual issue of mental retardation, but only in the form of recommendation from the trial judge to this Court in his or her report.

24. This Court has been charged, pursuant to 21 O.S.2001, § 701.13, with the responsibility of conducting a sentence review of every criminal defendant who has been sentenced to death. Part of our responsibility is to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." In reflecting upon that responsibility, as it applies to the issue at hand, i.e., mental retardation, we can foresee the possibility of a jury becoming so incensed or angered about the circumstances of a crime that the deci-

sion regarding mental retardation is unduly influenced. The *Atkins* hearing, as herein described, would seek to forestall that possibility and assist this Court in its mandatory sentence review.

25. We use the term *de novo* here to indicate that the Atkins hearing is not to be a mere rubber-stamping of the jury's factual determinations, but an independent review of the evidence of mental retardation by an objective, neutral judge, uninfluenced by the nature and circumstances of the crime, the persons affected thereby, or any outside influence.

26. Under an appropriate post-conviction record, this Court could, however, order a case remanded for resentencing without the necessity of an evidentiary hearing.

find: (1) there exist no controverted, previously unresolved factual issues material to the legality of Petitioner's confinement, except as provided below; (2) Petitioner's claim that his appellate counsel was ineffective for failing to adequately investigate, develop, and present available mitigating evidence is without merit; (3) Petitioner's *Apprendi* arguments are without merit; and (4) Petitioner's claims related to mental retardation have merit as per *Atkins* and as further stated above.

¶ 38 Accordingly, Petitioner's Application for Post–Conviction Relief, Motion for Evidentiary Hearing, and Motion to Hold Post–Conviction Case in Abeyance are **DENIED** as to all issues except proposition three. Petitioner's Application for Post–Conviction Relief and Motion for Evidentiary Hearing are hereby **GRANTED** with respect to the issue of mental retardation, as set forth below.

¶ 39 This case is therefore **REMANDED** to the District Court of McIntosh County for an evidentiary hearing on the sole issue of Petitioner's claim of mental retardation in accordance with this Order. At that hearing, which shall be held within sixty (60) days from the date of this Order, the District Judge shall determine if Petitioner has raised sufficient evidence [27] (at trial, on appeal, or at the evidentiary hearing) of his mental retardation, in accordance with the definition set forth herein, for the issue of mental retardation to be decided as a question of fact by a jury at a resentencing hearing. Thereafter, the trial judge shall submit within twenty (20) days his written findings concerning this issue to this Court, together with the transcript and record of the proceedings. Within twenty days from the issuance of those written findings, the parties may submit briefs of no more than ten pages to this Court in response thereto and addressing the Court's findings, *Atkins*, or this Order.

JOHNSON, V.P.J., concur in part/dissent in part.

CHAPEL, J., concur in results.

STRUBHAR, P.J., and LILE, J., concur.

### APPENDIX "A"

### *JURY INSTRUCTION TO BE USED WHEN ISSUE OF MENTAL RETARDATION HAS BEEN RAISED*

A conviction for Murder in the First Degree is punishable by death, life imprisonment without the possibility of parole, or life imprisonment. The Defendant has raised mental retardation as a bar to the imposition of the death penalty in this case. You must determine if the Defendant suffers from mental retardation as it is defined below before deciding what sentence to impose.

You are advised that a person is "mentally retarded" if he or she functions at a significantly sub-average intellectual level that substantially limits his or her ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others. Intelligence quotients are one of the many factors that may be considered, but are not alone determinative.

In reaching your decision, you must determine:

(1) Is the defendant a person who is mentally retarded as defined in this instruction?

(2) Was the mental retardation present and known before the defendant was eighteen (18) years of age?

(3) Does the defendant have significant limitations in adaptive functions in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work?

If you find by a preponderance of the evidence that the answer to **each** of these questions is yes, then you must so indicate on your verdict form. You must then decide whether the defendant shall be sentenced to life imprisonment or life imprisonment with-

---

27. That is, enough evidence to create a fact question on the issue of whether the Petitioner is mentally retarded, as herein defined.

out the possibility of parole and so indicate on your verdict form. If you find the answer to **any** of the above questions is no, you must so indicate on your verdict form. You must then decide whether the defendant shall be sentenced to life imprisonment, life imprisonment without the possibility of parole or death.

Preponderance of the evidence means more probable than not.

### OUJI-CR 4-87A

## <u>VERDICT FORM TO BE USED WHEN</u>
## <u>ISSUE OF MENTAL RETARDATION HAS BEEN RAISED</u>

IN THE DISTRICT COURT OF THE _____ JUDICIAL DISTRICT OF THE STATE OF OKLAHOMA SITTING IN AND FOR _____ COUNTY

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. _____ |
| | ) | |
| JOHN DOE, | ) | |
| | ) | |
| Defendant. | ) | |

### VERDICT

We, the jury, empaneled and sworn in the above-entitled cause, do, upon our oaths. find as follows:

Defendant is:

_____ Mentally retarded, as defined by the Court's instructions, and fix his/her punishment at

_____.

_____ Not mentally retarded, as defined by the Court's instructions, and fix his/her punishment at

_____.

_____
FOREPERSON

JOHNSON, V.P.J., concurs in part/dissents in part.

¶ 1 I agree with the majority that this case must be remanded for a hearing on the issue of mental retardation. The U.S. Supreme Court has held that the mentally retarded cannot be executed and to execute the mentally retarded is unconstitutional. *Atkins v. Virginia*, — U.S. ——, 122 S.Ct. 2242, 153

L.Ed.2d 335 (2002). This is a new rule of law.

¶ 2 I dissent as to the procedure established by the Court as to the determination of mental retardation. Judge Chapel in his Concurring in Result has outlined a procedure that I would also adopt. The trial court should hold a pretrial evidentiary hearing to determine mental retardation. If the trial court determines by a preponderance of the evidence that the defendant is mentally retarded, the trial would proceed as a non-capital first-degree murder case. If the court should not so find, the jury then would make this determination prior to any second stage evidence. Therefore, I would concur in the full procedure set forth in Judge Chapel's Concurring in Result opinion.

¶ 3 It should be pointed out that after a jury has made a determination that there is no mental retardation, a trial judge is not going to set that jury determination aside. Trial judges just do not like to change a jury finding. Hopefully, if the majority's procedure is the one that is followed, then it would be my wish that trial judges would certainly look at the evidence closely as to mental retardation and use their judgment as to same. I also want to make it clear that the legal doctrine of waiver will not or should not apply in mentally retarded defendants cases. Clearly, the U.S. Supreme Court's cases and the majority's opinion herein make this a new rule of law and the waiver doctrine would not apply.

CHAPEL, J., concurring in result.

¶ 1 I agree that Murphy's case must be remanded for a hearing on the issue of mental retardation. I have serious reservations about the majority's analysis of this and another claim, and disagree with the proposed procedures to be used in deciding this and future mental retardation claims.

¶ 2 I disagree with the way in which the majority resolves issues raised by *Atkins v. Virginia.*[1] *Atkins* found executing the mentally retarded is unconstitutional. This is a flat prohibition. Under *Atkins,* a mentally retarded person is not eligible for the death penalty. The Court's sense of urgency in resolving *Atkins* issues stems from its desire to provide trial courts guidance in upcoming jury trials; however, we should not rule so quickly that we fail to consider the requirements of *Atkins* or the implications of the procedures we impose. I am afraid this majority opinion makes both these mistakes.

¶ 3 Initially addressing the *Atkins* claim on post-conviction, the majority mistakenly states without citation that "[u]nder normal circumstances" this claim would be waived.[2] This is not the case. Oklahoma's post-conviction statute requires this Court to hear claims which could not have been raised on direct appeal and support a conclusion that the outcome of the trial would have been different.[3] Grounds for relief are waived if they were available to the defendant before the last date on which an application could be timely filed.[4] There is no question that *Atkins* represents a significant change in the law. Before June 20, 2002, neither the United States Supreme Court nor this Court had held that mentally retarded persons were not eligible for the death penalty. In fact, both courts had held exactly the opposite.[5] A colorable death penalty claim based on mental retardation could not have been reasonably formulated from any decision binding on any court in this state. While some intrepid attorneys persisted in raising what was then a frivolous issue, there was neither expectation nor hope that the claim could prevail, until *Atkins* was decided. The mental retardation issue could not have been raised in

---

1. —— U.S. ——, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

2. Op. at 566.

3. 22 O.S.2001, § 1089(C)(1),(2). Similarly, the issue will be appropriately raised in subsequent applications for post-conviction relief, because the legal basis was previously unavailable. 22 O.S.2001, §§ 1089(D)(8),(9).

4. 22 O.S.2001, § 1089(D)(2).

5. *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Lambert v. State,* 1999 OK CR 17, 984 P.2d 221, *cert. denied,* 528 U.S. 1087, 120 S.Ct. 816, 145 L.Ed.2d 687 (2000).

Murphy's direct appeal because there was no legal basis to support it, and if he is mentally retarded the outcome of the trial would as a matter of law have been different. This claim is squarely within the scope of the post-conviction act. It has not been waived and this Court must consider it on its merits.

¶ 4 The majority opinion wants to have it both ways. The opinion first claims the issue is waived, but considers it given the "recent flurry of activity" on the issue.[6] *Atkins* is not part of a "flurry of activity". It is binding constitutional precedent which this Court must follow. Either the issue was waived or it was not. If the issue was waived, the remainder of the majority opinion is worse than dicta—the Court is deciding a question it has no statutory authority to answer. If the issue is, as I believe, properly raised under § 1089(C), we do not need to make excuses for our decision to address this issue. In any case, the issue before us is the post-conviction claim. I understand the majority's desire to provide guidance to trial courts which will hear this issue in future cases, but the portion of the opinion dealing with trial procedure is dicta.

¶ 5 As we address these issues, the Court has the unusual but welcome benefit of a recent, clear expression of Legislative intent. This term's passage of House Bill 2635 was intended to prohibit execution of the mentally retarded (not limit it under certain conditions, as the majority suggests in note 13). House Bill 2635 provided some definitions and standards for determining who is mentally retarded and may not be death-eligible, and the majority borrows substantially from the Bill to define mental retardation.[7] While the Governor refused to sign House Bill 2635, its passage may be taken as an expression of the will of the majority of Oklahomans, showing that our citizens, like most of the country as reflected in *Atkins*, do not wish to execute the mentally retarded. I emphasize this because any procedure this

Court adopts for determining mental retardation in trial settings must respect both the spirit and the letter of the prohibition against execution. The majority opinion utterly fails to reflect both the Supreme Court's intent to flatly prohibit such executions and the will of the people in this regard.

¶ 6 I am troubled by the majority's definition of mental retardation, which is also incorporated into the proposed Instruction. Like House Bill 2635, the majority requires proof that mental retardation manifested itself before the age of 18. However, this requirement standing alone is ambiguous. In footnote 19 the opinion explains "manifestation" and suggests various methods of proof. At the least this explanation should be incorporated into the body of the definition. This definition also requires proof of an IQ of no more than seventy, through a scientifically recognized and approved and "contemporary" IQ test. Footnote 21 defines "contemporary" as either a test administered after the capital crime was committed, or "one that may be understood by contemporary standards." I have no idea what this means. Taken as a whole, the definition appears to require proof of mental retardation both before (manifested before age 18) and after (contemporary test) the crime occurred.

¶ 7 The definition states: "[N]o person with an intelligence quotient of more than seventy, as administered by a scientifically recognized and approved intelligent quotient test, shall be eligible to be considered mentally retarded." I am concerned that this might be misunderstood as saying that anyone with an IQ test over 70 cannot claim to be mentally retarded, no matter how severely he is developmentally disabled nor how significant his limitations in adaptive functioning. A person who is virtually unable to function but has a test score of 71 may not claim to be ineligible for the death penalty

6. Op. at 566.

7. The Bill provided that a defendant had to prove mental retardation by clear and convincing evidence. This standard was found unconstitutional in the competency context, which offers disturbing parallels to this situation. *Cooper v.*

*Oklahoma*, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996). The majority prudently uses the "preponderance" standard. This is particularly appropriate given *Cooper*, and the practice of the majority of states which have chosen preponderance as the proper standard in the mental retardation context.

**574**

by mental retardation. I am also concerned that this may be misinterpreted as prohibiting a defendant from raising this claim if the defendant has one test score over 70 and one under 70. These possible results do not appear consistent with the *Atkins* conclusions that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills."[8] *Atkins* gave the states the task of developing appropriate enforcement procedures. In doing so, the Supreme Court surely intended states to take seriously (a) its discussion of the pertinent characteristics of mental retardation which make execution an inappropriate punishment, and (b) its conclusion that mentally retarded persons should not be executed. The majority's insistence on an IQ no greater than 70 follows the letter, but not the spirit, of *Atkins*. It also creates a more narrow definition than that passed by the Legislature. House Bill 2635 defined "significantly subaverage general intellectual functioning" as an IQ of 70 or below, but did not prohibit persons with higher tests from raising the issue of mental retardation, as long as they also had one IQ test with results of 70 or below, and showed significant limitations in adaptive functioning.

¶ 8 This definition also poses practical problems. If a defendant—particularly an indigent, mentally challenged one—has no school record, or is a transient, or a foreigner, or just moved to Oklahoma as an adult, there may well be no available proof of manifestation before the age of 18. This defendant would be precluded from raising mental retardation even with an IQ of 56, tested near the time of the crime, and a showing of little or no ability to function according to the enumerated categories. That is, a clearly mentally retarded adult, who was mentally retarded at the time he committed a crime, would be eligible for the death penalty simply because he had no childhood evidence to present. This conforms neither to the letter nor the spirit of the prohibition against executing mentally retarded people. I share the

majority's unstated concern that murderers will suddenly claim they are mentally retarded after commission of their crimes in an effort to avoid capital punishment. However, I believe the definition of mental retardation should be flexible enough that an entire class of mentally retarded persons is not automatically (and illegally) exposed to the death penalty simply because their situation prevents them from bringing forth evidence from childhood.

¶ 9 This case is brought as a first postconviction claim; evidence of mental retardation was presented to the jury in mitigation, but the issue of execution of the mentally retarded was not raised on appeal. Following the letter of *Atkins*, the majority reluctantly agrees that Murphy is entitled to raise this issue before being executed. The opinion reasonably concludes that the mental retardation issue must be remanded to the trial court for an evidentiary hearing on the issue of mental retardation.[9] However, the opinion directs the court to determine whether Murphy has raised "sufficient evidence"—defined as "enough evidence to create a fact question on the issue"—of mental retardation, for the issue to be decided as a question of fact by a jury at a resentencing hearing.[10] The majority would require the trial court to make findings of fact and conclusions of law determining whether the defendant has met his burden (of "sufficient evidence"), and submit those findings and conclusions to this Court, after which the parties would submit briefs on the issue.

¶ 10 In its haste to issue an opinion, the majority appears to have no real idea what the post-conviction procedure in this and similar cases will be. I agree that our capital post-conviction statute vests jurisdiction in this Court,[11] and the trial court's findings of fact and conclusions of law should be filed in this Court. However, the majority's plan raises more questions than it answers. Why do we burden the trial court with the extremely nebulous phrase "sufficient evidence"? Why not simply require a defen-

8. *Atkins*, —— U.S. at ——, 122 S.Ct. at 2250.

9. 22 O.S.2001, § 1089(D)(5).

10. Op. at 570.

11. 22 O.S.2001, § 1089(D)(1).

dant to prove his claim in the evidentiary hearing by a preponderance of the evidence, which the majority has already adopted as the appropriate evidentiary standard? Why, after this Court receives the trial court's findings and conclusions, must we require the parties to submit briefs? The post-conviction statute refers to the trial court's determination of issues on remand as an "entry of judgment," and provides that either party may seek this Court's review of that determination within ten days.[12] In the absence of such a request for review, the Legislature directs this Court to either adopt the trial court's findings, or order additional briefing.[13] In contrast, the majority would have the issue briefed automatically. Is this Court planning to act as a fact-finder on the issue of mental retardation? The opinion implies that any colorable claim of mental retardation will be remanded again for jury consideration at a resentencing hearing. Why, if the trial court determines by a preponderance of the evidence that Murphy is mentally retarded and not death-eligible, must the question of mental retardation be remanded again as a jury question? If the trial court's conclusions are to have no weight, why not remand the issue to a jury in the first place? I would adopt a simpler system.

¶ 11 I would remand this case to the trial court for an evidentiary hearing on the issue of mental retardation. If neither party seeks review of the claim, I would review the trial court's findings and conclusions and have the Court determine the issue. I see no need to automatically require additional briefing in every case. If the trial court concludes that Murphy has proved he is mentally retarded by a preponderance of the evidence, and we adopt that finding, I would remand the case for jury resentencing to life or life without parole (or judge resentencing, if both parties waive a jury proceeding). If the trial court finds Murphy has not shown retardation by a preponderance of the evidence, I would still remand the case for jury resentencing. Under those circumstances, Murphy would be allowed to present evidence of mental retar-

dation separately (using a preponderance of the evidence standard), and jurors would deliberate on that question before the capital sentencing trial began. If jurors find Murphy is mentally retarded, they would subsequently hear evidence on and consider only the punishments of life or life without parole. If jurors find otherwise, the capital punishment resentencing procedure would begin.

¶ 12 I particularly disagree with the dicta on page 22, where the majority severely and unnecessarily restricts the ability of defendants to raise mental retardation on post-conviction or in pending cases. Essentially, the majority disallows any claim in which mental retardation was not previously raised in some fashion either at trial or on appeal to this Court. If a mentally retarded defendant had counsel who followed the pre-*Atkins* settled law, and heeded this Court's admonition not to raise every issue or "frivolous" issues, that defendant would be barred from raising this claim in a pending case. This procedure specifically allows the execution of mentally retarded defendants whose counsel failed to jump through hoops created in this opinion. This sweeping use of waiver does not comply with either the letter or spirit of *Atkins* or the will of the Legislature. Nor does it have any chance of passing constitutional challenges in the federal system. It also fails to conform to the plain language of the post-conviction statute, which allows for exactly this type of claim in initial or subsequent post-conviction applications.[14] Further, this issue of death-eligibility is fundamental. If a defendant is not eligible for the death penalty, there should be no capital trial. I do not believe this Court can or should force the use of procedural waiver to prevent these claims.

¶ 13 In setting forth a procedure for trial courts to use in future cases, this court should focus on the primary issue—death-eligibility. If a defendant is mentally retarded, he is not eligible for the death penalty, and the jury should not hear or consider evidence which would support a death sentence. The only possible sentences are life or life without parole. In order to assure

**12.** 22 O.S.2001, § 1089(D)(7).

**13.** *Id.*

**14.** 22 O.S.2001, §§ 1089(C), (D)(8),(9).

that the trial is not tainted with capital-stage evidence which can only improperly appeal to jurors' emotions and passions (being irrelevant to any sentencing issue), I would require the trial court to settle the issue before the trial begins. In fairness to the State, a defendant should give notice of his intent to raise mental retardation before a jury is picked.[15] The trial court should hold a pretrial evidentiary hearing at which the defendant may present evidence to support his claim of mental retardation. If the trial court finds by a preponderance of the evidence that the defendant is mentally retarded, the trial should proceed as a non-capital first degree murder case. If the trial court does not so find, then the capital case should proceed. However, before aggravating or mitigating evidence is presented in the second stage, the defendant may submit evidence to the jury to support his claim that he is mentally retarded, again by a preponderance of the evidence. Jurors should deliberate on this issue immediately after presentation of this evidence; if the jury finds by a preponderance that a defendant is mentally retarded, they will consider and recommend a non-capital punishment at that time.[16] The capital sentencing hearing will continue only if the jury finds a defendant has not shown he is mentally retarded.

¶ 14 In contrast to the procedures I would adopt as set forth above, the majority does not substantially change the current capital trial procedures. Although the majority requires prior written notice of intent to claim mental retardation, no determination of retardation is made until after the defendant has been convicted of first degree murder in the first stage of trial.[17] The majority requires jurors to hear all the evidence in aggravation and mitigation at the same time, and in the same sentencing proceeding, that evidence of mental retardation is presented. Although the burden of proof differs both in degree (preponderance v. reasonable doubt) and location (defendant v. State), jurors would consider a defendant's mental retardation claim at the same time they consider imposing the death penalty, and in light of the aggravating evidence used to support that sentence. After the jury recommends a verdict, and only upon a defendant's written request made after the verdict, the trial court shall hold an "*Atkins* hearing" on the issue of mental retardation. No new evidence may be presented at this meaningless hearing, but each party may argue to the trial court. The trial court shall review the trial evidence of mental retardation *de novo* and make written findings and conclusions regarding mental retardation. If the trial court finds that the jury erred in determining a defendant was not mentally ill, the defendant may use that finding in an appeal to this Court, as part of our mandatory sentence review.

¶ 15 There is a huge contrast in these two approaches. The majority procedure unnecessarily wastes judicial resources without providing any significant degree of protection to either the defendant or the State. Why should the state of Oklahoma pay for a capital trial, and why should judicial resources be consumed in conducting a capital trial, where the defendant is not eligible for the death penalty? Why should witnesses, including the grieving family members of the murder victim, be forced to endure a capital second-

---

15. The majority requires this, but specifically holds that failure to give written notice waives the issue. This Court has held that failure to file written notice of an insanity defense in a capital case does not justify a trial court's refusal to allow the evidence, where the State was aware well before trial of the defendant's intent to present the defense. *Allen v. State,* 1997 OK CR 44, 944 P.2d 934, 936. Given the importance of a mental retardation claim—a determination of death-eligibility—this imposition of a blanket waiver rule for failure to file written notice runs counter to both this Court's precedent and the Constitution.

16. This provision is consistent with the *Ring* decision that a capital jury must make any factual findings bearing on capital punishment beyond a reasonable doubt.

17. The majority prefaces the discussion of trial procedure with the clause, "Unless the issue of mental retardation is resolved prior to trial...." Op. at 568. In context, this phrase is meaningless. The majority sets forth a detailed, restrictive and exclusive scheme which utterly removes the trial court's independent authority to decide mental retardation claims. Under these circumstances, a defendant has no avenue to raise, and a trial court no authority to hear, mental retardation issues prior to trial.

stage proceeding and even give evidence regarding their loved one, when that evidence can have no relevance because the defendant is not death-eligible? Why should jurors be presented with evidence of aggravating circumstances which cannot be charged, much less found, because the defendant cannot be executed? Partly due to a mentally retarded defendant's cognitive and behavioral impairments,[18] aggravating circumstances in these cases are often horrible; the defendants frequently are poor witnesses and may not exhibit remorse, and evidence of mental retardation itself may be aggravating in some jurors' minds.[19] What possible purpose is served by allowing a jury to hear evidence in aggravation, and victim impact evidence, which is irrelevant to sentencing and can only be inflammatory? The majority asks jurors to disregard what may be truly awful circumstances of the crime, and even a genuinely unpleasant defendant, because that defendant is more likely than not retarded. Why should jurors be put in this impossible position? Finally, why is the trial court not allowed to act on the results of the majority's ill-advised post-trial *Atkins* hearing? In any other circumstance where a trial court determines the jury has erred, the court may issue a judgment notwithstanding the verdict.[20] Here, where the issue is of constitutional dimensions and concerns a defendant's inability to be executed, this Court deprives the trial court of any authority to remedy a clearly erroneous jury verdict, most probably caused by the irrelevant evidence in aggravation.

¶ 16 The answer may be found in the majority's characterization of a jury verdict recommending execution for a mentally retarded person: "an excessive sentence."[21] The

death penalty for a mentally retarded person is not an excessive sentence—it is an *illegal* sentence. The majority belief otherwise reflects a profound misunderstanding of *Atkins* and the intent of House Bill 2635. It is unconstitutional to execute mentally retarded people. This Court is charged with devising trial and appellate procedures which will ensure that mentally retarded people are not charged with the death penalty, convicted of a capital crime, or executed. Rather than trying to scrupulously fulfill this charge, the majority winks at it. This Court has the opportunity to construct a simple, easily followed procedure which considers death-eligibility before the trial begins. The majority treats the mental retardation question as an afterthought, and provides jurors no opportunity to decide this question free from other evidentiary distractions. The opinion would not even allow a trial court to override a jury's mistaken finding that a defendant was not mentally retarded (and thus could not receive death)—the trial court may only state this finding, which may be used *in a claim on appeal* ! There can be no clearer indication that the majority is not concerned with preventing the execution of the mentally retarded. Instead, the majority sets forth procedures in pending and future cases which, taken together, allow the continued execution of mentally retarded defendants. I regret to say that I believe the majority opinion is primarily concerned with limiting the determination of mental retardation, thus limiting "those who fit within [*Atkins's* ] holding".[22]

¶ 17 I also disagree with the majority's analysis of Murphy's *Apprendi*[23] claim that the instructions were unconstitutional because jurors were not told that aggravating circumstances must outweigh mitigating evi-

18. *Atkins*, —— U.S. at ——, 122 S.Ct. at 2251.

19. *Atkins*, —— U.S. at ——, 122 S.Ct. at 2252. For these reasons, *Atkins* noted "Mentally retarded defendants in the aggregate face a special risk of wrongful execution." *Id.* The majority admits this possibility in footnote 24.

20. 12 O.S.2001, § 698.

21. Op. at 568.

22. Op. at 567. In reaching this conclusion I note other phrases within the majority opinion.

On page 567, the majority says *Atkins* "appears to be" a new rule of law. In Footnote 16, the author notes his disagreement with *Atkins's* inclusion of national consensus in its Eighth Amendment analysis. Also on page 567, the majority notes that the mentally retarded may commit crimes in Oklahoma, "yet" are no longer death-eligible under *Atkins*.

23. *Apprendi v. New Jersey*, 530 U.S. 466, 482–83, 120 S.Ct. 2348, 2358–59, 147 L.Ed.2d 435 (2000).

dence beyond a reasonable doubt. I believe we must review this claim not only under *Apprendi*, but in light of *Ring v. Arizona*.[24] *Ring* held that a capital jury must make any factual findings bearing on capital punishment beyond a reasonable doubt.[25] In one sentence, the majority manages to both misconstrue and ignore *Ring;* that opinion does not "apparently" extend *Apprendi* to capital cases, it does so explicitly and must be part of our analysis of this claim. I do not find Murphy's claim has merit.[26] Under Oklahoma law jurors are the fact-finders throughout a capital trial.[27] *Ring* assigns to the jury any substantive element of a capital offense, described as that which makes an increase in authorized punishment contingent on a finding of fact.[28] The substantive element of capital murder in Oklahoma is the jury's finding of the aggravating circumstance necessary to support a capital sentence. The increase in punishment from life imprisonment without parole to the death penalty is contingent on the jury's factual finding of an aggravating circumstance. Oklahoma's provision that this finding be made by jurors beyond a reasonable doubt is all that *Ring* requires.

**24.** —— U.S. ——, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

**25.** *Ring*, —— U.S. at —— – ——, ——, 122 S.Ct. at 2439–40, 2443; *see also Apprendi*, 530 U.S. at 483–84, 120 S.Ct. at 2359 (jury must find fact authorizing greater punishment beyond a reasonable doubt). Given *Ring's* explicit extension of *Apprendi*, the majority's interpretation of *Apprendi* as not reaching this claim is moot. I am unable to understand the majority's comment that *Apprendi* itself was a 5–4 decision and, presumably, not entitled to the same weight as Supreme Court cases decided by a larger majority (like *Ring* ). All Supreme Court decisions decided by a majority are equally binding on this Court, no matter how little we agree with the Supreme Court's interpretations.

**26.** *See Cannon v. State*, No. PCD–2002–877 (Okl. Cr. July, 18, 2002) (not for publication).

**27.** 21 O.S.2001, §§ 701.10, 701.11.

**28.** *Ring*, —— U.S. at ——, 122 S.Ct. at 2439. *See also Apprendi*, 530 U.S. at 494, n. 19, 120 S.Ct. at 2365, n. 19 (an increase beyond a maximum authorized statutory sentence is the functional equivalent of an element of a greater offense).