THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARY BRAGGS, Defendant-Appellant.

First District (5th Division)  No. 1—01—0110

Opinion filed November 8, 2002.

Rita A. Fry, Public Defender, of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Margaret J. Campos, and Emily J. Grzanka, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINN delivered the opinion of the court:

Defendant, Mary Braggs, was charged by indictment with two counts of first degree murder for the deaths of Connie Hall and Donald Rudolph. The initial trial court refused to conduct a hearing on defendant's motion to suppress statements. The trial court subsequently found defendant unfit to stand trial and a discharge hearing was held. At that hearing, the trial court found that the evidence was sufficient to establish defendant's guilt beyond a reasonable doubt and remanded defendant to the Department of Mental Health and Developmental Disabilities (Department of Mental Health) for a period of five years.

On appeal, this court held that the trial court erred when it refused to conduct a hearing on defendant's motion to suppress and directed the trial court to conduct a hearing on remand. *People v. Braggs*, 302 Ill. App. 3d 602 (1998). This court additionally held that the evidence was sufficient to establish guilt beyond a reasonable doubt for purposes of the discharge hearing.

On remand, the trial court conducted a hearing on defendant's motion to suppress and, in finding that defendant was not mentally competent to waive her *Miranda* rights, granted defendant's motion with respect to the statements made to the assistant State's Attorney following defendant's arrest. The trial court did not suppress defendant's statement made to detectives shortly after she arrived at the police station. The trial court held that a new discharge hearing was not necessary and reinstated the original order committing defendant to the Department of Mental Health. Defendant now appeals.

On appeal, defendant argues that the trial court improperly denied her motion to suppress in that her statements were not voluntary. Defendant additionally argues that the trial court erred in refusing to hold a new discharge hearing.

For the following reasons, we reverse and remand.

## I. BACKGROUND

On July 23, 1993, defendant was indicted on two counts of first degree murder. On June 20, 1996, the initial trial court, after refusing to conduct a hearing on defendant's motion to suppress statements, found defendant unfit to stand trial. The trial court found that defendant, in all probability, would remain unfit indefinitely in light of her mental retardation. The trial court subsequently held a discharge hearing pursuant to section 104—25 of the Code of Criminal Procedure of 1963 (725 ILCS 5/104—25 (West 1996)). At that hearing, a Chicago police detective testified that on July 25, 1993, after he advised

defendant of her *Miranda* warnings, defendant told him that she and Connie Hall were in an apartment together on April 28, 1993, when Donald Rudolph returned. Rudolph was drunk and struck both defendant and Hall. Defendant then knocked Rudolph down and he struck his head. Hall became upset, accusing defendant of killing Rudolph, and defendant then stabbed Hall a number of times in her upper body. The trial court found this evidence sufficient to establish defendant's guilt beyond a reasonable doubt. Defendant was remanded to the Department of Mental Health for a period of five years.

Defendant appealed. On appeal, we remanded the matter for a hearing on defendant's motion to suppress, holding that the trial court erred in refusing to conduct the hearing. *Braggs*, 302 Ill. App. 3d at 606. We also held that the evidence introduced against defendant, when viewed in its aspect most favorable to the State, was sufficient to establish her guilt beyond a reasonable doubt for purposes of the discharge hearing.

On remand, the following evidence was introduced at the hearing on the motion to suppress statements. Chicago police detective Edward Winstead testified that he was assigned to investigate the deaths of Donald Rudolph and Connie Hall. The victims' bodies were both found in a first-floor apartment located on South Prairie Avenue in Chicago on April 28, 1993. Hall died as a result of multiple stab wounds. Rudolph died as a result of strangulation. During the course of the investigation, Winstead began looking for defendant. On May 7, 1993, Survilla Cameron, defendant's sister and guardian, contacted Winstead and informed him that defendant lived with her. Winstead transported defendant and Cameron to Area One and questioned her. Cameron informed Winstead that defendant was mentally incompetent. Defendant was not advised of her *Miranda* rights. Winstead testified he had difficulty communicating with defendant, that "sometimes she wouldn't answer" questions, and that she was "very slow in answering."

Winstead testified that, in summary, defendant told him that she was in the apartment when two black males came to the door. Defendant heard an argument and hid in the closet. When she came out, defendant saw Hall dead in the bedroom. Defendant said Hall had been stabbed and was wearing white. Defendant said Rudolph was in the front room and that he had been hit in the head with a wrench and had been strangled to death. Winstead testified that defendant's description was "very accurate as to how the victims died and where they were found." Winstead then took defendant and Cameron home.

On the morning of May 9, Winstead questioned defendant at Cameron's apartment with Cameron present. Defendant said that one of

the men was named Ron and that he was a friend of Cleo's. Defendant described the other man as a tall black male. Winstead testified that the investigation revealed Ron Thomas was an acquaintance of Cleo and the victims, and when Winstead located him he was with a tall black male named Mike. Later that same afternoon, Winstead picked up defendant and Cameron and took them to Area One. Winstead, in the company of Cameron, showed defendant photographs of Ron Thomas and Mike. Defendant quickly identified the photograph of Mike as being the tall black male. At first she was uncertain of the identity of Ron Thomas, then she was certain it was him. Winstead testified that when he informed defendant the men were at the police station, defendant changed her story. Defendant then said that these were not the two men who came to the apartment and that it was two different men. Defendant said two guys came to the door and she hid in the closet.

Winstead testified that on that same afternoon he took defendant and Cameron to the scene of the crime. Defendant pointed out where the two bodies were found. Winstead testified that her account was consistent with where the bodies were found by the police. Defendant then pointed out the closet she hid in. Upon examining the closet, Winstead testified that defendant "couldn't have possibly fit in there." Winstead then took defendant and Cameron home.

On May 12, Winstead transported defendant and Cameron to the polygraph unit of the Chicago police department. Although defendant was cooperative, the polygraph examination was inconclusive because defendant did not register enough emotion. Again, defendant was returned to Cameron's apartment. Cameron and defendant subsequently moved residences.

On June 25, 1993, at around noon, Winstead picked up defendant and Cameron from their new apartment and took them to Area One for questioning. Prior to the questioning, Winstead informed Cameron the police were now looking at defendant as a potential suspect. Winstead, another detective, defendant and Cameron were present in the interview room. Winstead advised defendant of her *Miranda* warnings, to which defendant nodded her head in an affirmative manner. Following an hour-long interview, defendant was placed under arrest. An assistant State's Attorney arrived and again advised defendant of her *Miranda* warnings.

Dr. Philip Pan, a psychiatrist, testified for the defense. On May 16, 1996, Pan diagnosed the defendant as having moderate mental retardation and being unfit to stand trial. Pan testified it was not likely she could be restored to fitness any time in the near future. On August 31, 1999, Pan again evaluated defendant. Pan opined that

defendant was incapable of understanding *Miranda* warnings. Dr. Pan further testified that defendant could give simple answers to questions she understood but she was not capable of abstract thinking. Dr. Pan explained that this meant defendant was unable to think about the higher meaning something may have. Defendant told Dr. Pan she was 29 years old when in reality she was 56. Dr. Pan also testified that defendant was unfit for trial and would not become fit in the future.

Dr. Linda Wertzel, a clinical psychologist, also testified for the defense. On May 21, 1994, Wertzel examined defendant and concluded she was mentally retarded with an I.Q. of 54. Wertzel concluded defendant mathematically functioned at a kindergarten level. Wertzel also concluded that defendant was unable to understand her *Miranda* rights. Wertzel examined defendant again in October 1999 and concluded she remained unable to understand her *Miranda* warnings. Dr. Wertzel testified that the defendant was emotionally blunted and passive. She was illiterate and was only able to express herself at a very simple, childish level. Defendant had a limited ability to comprehend more than a one-step command. Defendant was unable to cooperate with her attorney.

In rebuttal, the State called Assistant State's Attorney (ASA) Stan Gonsalves. Gonsalves testified he went to Area One on June 25, 1993, to interview defendant. Prior to meeting defendant, detectives told Gonsalves defendant was a little slow. Gonsalves advised defendant of her *Miranda* warnings. Defendant did not respond verbally when she was asked if she understood her rights individually. Defendant nodded her head affirmatively after Gonsalves finished giving her the *Miranda* warnings.

Following the hearing, the trial court, in an 11-page finding, first determined that the issue facing the court was twofold: whether defendant's statement was obtained free of coercion or misconduct; and whether defendant's waiver of her *Miranda* rights was "knowing and intelligent." The court found that there was not even a suggestion that the police had done anything to coerce the defendant to give a statement. The trial court also found defendant was not in custody until after she confessed to Winstead, and therefore, any statements she made before that point were admissible. The trial court found that Winstead "gratuitously offered" defendant her *Miranda* warnings on the morning of her arrest even though the warnings were not needed. The trial court found that defendant was in custody following her statement to the police and that she did not knowingly and intelligently waive her *Miranda* warnings. In doing so, the court relied upon the testimony of Dr. Pan and Dr. Wertzel. The court also relied upon "the testimony of Winstead about how she acted and [Assistant]

State's Attorney Gonsalves that she did not respond verbally [when] given her rights. She merely stood silent.'' The court found that defendant was mentally handicapped and then held ''that goes to the weight of those statements, not to whether those statements were admissible.'' Therefore, the court denied defendant's motion with respect to any statements made before defendant was in custody, but suppressed the statement made to ASA Gonsalves following her arrest.

Defendant's motion to reconsider was denied. The trial court then ruled that the original order of June 27, 1996, committing defendant to the Department of Mental Health, should stand. In recognizing the appellate court's instruction that ''[i]n the event that motion [motion to suppress] is granted and the statements of defendant are suppressed, the circuit court shall conduct a new discharge hearing'' (*Braggs*, 302 Ill. App. 3d at 607), the trial court held that a new discharge hearing was unnecessary. The testimony at the previous discharge hearing only involved defendant's unsuppressed statement to the police. Defendant's statement to Gonsalves was not introduced at the discharge hearing. Therefore, the trial court reasoned that the evidence would be the same and a new hearing would be unnecessary. Defendant now appeals.

## II. ANALYSIS

■ We review the ultimate question of whether a confession is voluntary *de novo*, but we accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence. *In re G.O.*, 191 Ill. 2d 37, 49-50 (2000).

In denying defendant's motion to suppress, the trial court relied upon *Colorado v. Connelly*, 479 U.S. 157, 93 L. Ed. 2d 473, 107 S. Ct. 515 (1986). In *Connelly*, the defendant approached a uniformed police officer in downtown Denver on August 18, 1983. Connelly told the officer that he had murdered someone and he wanted to talk about it. The officer gave Connelly his *Miranda* rights. Connelly said he understood his rights and he would talk to the officer because his conscience had been bothering him. A detective arrived and he again advised Connelly of his *Miranda* rights. Connelly said he had come all the way from Boston to confess to the murder of Mary Ann Junta, a young girl he had killed in Denver in November 1982. A search of police records revealed that the body of an unknown female had been found in April 1983. Connelly readily agreed to take the police to the scene of the killing. He pointed out the exact location of the murder. The police testified that Connelly appeared to fully understand the

nature of his acts and they did not perceive any indication that Connelly was suffering from any kind of mental illness.

When Connelly was interviewed by the public defender the next morning, he appeared to be disoriented. He gave confused answers to questions and said that "voices" had told him to come to Denver and that he had confessed because the voices told him to. Connelly was initially found incompetent to assist in his own defense, but by March 1984, doctors found him competent to stand trial. In a preliminary hearing, defendant moved to suppress all his statements. A psychiatrist testified that defendant was suffering from chronic schizophrenia and was in a psychotic state at least as of the day before he confessed. The psychiatrist testified that, in his expert opinion, defendant was experiencing "command hallucinations." *Connelly*, 479 U.S. at 161, 93 L. Ed. 2d at 480-81, 107 S. Ct. at 518-19. This condition interfered with his ability to make "free and rational choices." *Connelly*, 479 U.S. at 161, 93 L. Ed. 2d at 481, 107 S. Ct. at 519. He further testified that Connelly's illness did not significantly impair his cognitive abilities. Thus, defendant understood his rights when the police gave them.

The Colorado Supreme Court affirmed the trial court's suppression of the defendant's statements. *People v. Connelley*, 702 P.2d 722 (Colo. 1985). The court found that the admission of the confession in a court of law was sufficient state action to implicate the due process clause of the fourteenth amendment. The court held "the absence of police coercion or duress does not foreclose a finding of involuntariness. One's capacity for rational judgment and free choice may be overborne as much by certain forms of severe mental illness as by external pressure." *Connelly*, 702 P.2d at 728. As Connelly's initial statement was not the product of a rational intellect and a free will, it was properly suppressed. Further, Connelly's mental condition precluded his ability to make a valid waiver of his constitutional rights. Therefore, his statement made while in custody was also properly suppressed. *Connelly*, 702 P.2d at 729.

■ The United States Supreme Court first reversed the Colorado Supreme Court's holding that Connelly's confession violated due process.

> "Respondent would now have us require sweeping inquiries into the state of mind of a criminal defendant who has confessed, inquiries quite divorced from any coercion brought to bear on the defendant by the State. We think the Constitution rightly leaves this sort of inquiry to be resolved by state laws governing the admission of evidence and erects no standard of its own in this area. A statement rendered by one in the condition of respondent might be proved to be quite unreliable, but this is a matter to be

governed by the evidentiary laws of the forum, see, *e.g.*, Fed. Rule Evid. 601, and not by the Due Process Clause of the Fourteenth Amendment. 'The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false.' *Lisenba v. California*, 314 U.S. 219, 236[, 86 L. Ed. 166, 180, 62 S. Ct. 280, 290] (1941).

We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment. We also conclude that the taking of respondent's statements, and their admissions into evidence, constitute no violation of that Clause." *Connelly*, 479 U.S. at 166-67, 93 L. Ed. 2d at 484, 107 S. Ct. at 521-22.

The Supreme Court next considered whether Connelly's waiver of his constitutional rights was valid. The State conceded at oral argument that when Connelly was handcuffed, the custody requirement of *Miranda* was satisfied. In reversing the Colorado Supreme Court's suppression of the statements made by Connelly after he was in custody, the Supreme Court held:

"The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion. See *United States v. Washington*, 431 U.S. 181, 187[, 52 L. Ed. 2d 238, 245, 97 S. Ct. 1814, 1818] (1977); *Miranda*, [348 U.S. at 460, 16 L. Ed. 2d at 715, 86 S. Ct. at 1620]. Indeed, the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.' *Oregon v. Elstad*, 470 U.S. 298, 305[, 84 L. Ed. 2d 222, 229, 105 S. Ct. 1285, 1290] (1985). The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Connelly*, 479 U.S. at 170, 93 L. Ed. 2d at 486, 107 S. Ct. at 523.

The Supreme Court continued, "Respondent's perception of coercion flowing from the 'voice of God,' however important or significant such a perception may be in other disciplines, is a matter to which the United States Constitution does not speak." *Connelly*, 479 U.S. at 170-71, 93 L. Ed. 2d at 487, 107 S. Ct. at 523-24.

In basing its ruling on *Connelly*, the trial court focused on its penultimate holding: for a confession to be "involuntary" under the due process clause, there must be coercive police activity. In doing so, the trial court did not address *Connelly*'s instruction that inquiries into the state of mind of a criminal defendant who has confessed are to be resolved by state laws governing the admission of evidence: "A statement rendered by one in the condition of respondent might be proved

to be quite unreliable, but this is a matter to be governed by the evidentiary laws of the forum ***." *Connelly,* 479 U.S. at 167, 93 L. Ed. 2d at 484, 107 S. Ct. at 521-22.

The Illinois Supreme Court addressed the admissibility of confessions made by persons with special needs many decades prior to *Connelly* being decided. In *People v. Klyczek,* 307 Ill. 150 (1923), the court considered the admissibility of the confession of a 16-year-old Polish youth who averred that he did not understand the questions he was asked and that the confession written by the police was never read to him. The court held:

> "The situation in which the plaintiff in error was placed and the circumstances surrounding him at the time were proper to be taken into consideration by the court in determining the competency of the confession, including his youth and inexperience, his character, his intelligence, his strength of intellect, his knowledge or ignorance, and the fact that he was detained in prison and was interrogated by the police officer who held him in custody. *** The question of admissibility is finally whether, considering all the circumstances of this particular case, they were such that the statement of the plaintiff in error might have been induced by their influence to make a false confession." *Klyczek,* 307 Ill. at 154-55.

In *People v. Lambersky,* 410 Ill. 451 (1951), the supreme court considered the admissibility of a murder confession made by a defendant who had resided at the "Dixon State Hospital for mentally deficient persons, having been adjudicated feeble-minded by the circuit court of Cook County about thirteen years prior thereto." *Lambersky,* 410 Ill. at 453. The court held that confessions "involve a waiver of the constitutional right against self-incrimination and an intentional relinquishment of a known right. As an insane person cannot know of his constitutional rights, his confession is regarded as a nullity and cannot be treated as evidence against him. (*People v. Shroyer,* 336 Ill. 324 [(1929)].)" *Lambersky,* 410 Ill. at 455.

■ In *People v. Hester,* 39 Ill. 2d 489 (1968), the court reviewed the admissibility of a murder confession made by a 14-year-old whose mental age and abilities would have been approximately those of an 11-year-old at the time he confessed. The court held:

> "The general rule is that subnormal mentality does not *ipso facto* make a confession involuntary 'so long as the subnormality has not deprived the person in question of the capacity to understand the meaning and effect of the confession. But mental subnormality is a factor to be considered in determining the issues of voluntariness and admissibility, and, where accompanied by other factors indicative of an absence of voluntariness, will require that the confession be excluded.' (Annot., 69 A.L.R. 2d 348, 350; see *State v. Ordog,* 45

N.J. 347, 212 A.2d 370, 377; *People v. Lara*, 62 Cal. Rptr. 586, 601.)" *Hester*, 39 Ill. 2d at 500.

*Hester*'s holding that a nontreating defense psychiatric expert could not give an opinion based upon statements made to him by the accused because of the self-serving nature of the statements was overturned by *People v. Anderson*, 113 Ill. 2d 1, 13 (1986). However, *Hester* has been cited as good law as recently as *People v. Wiley*, 205 Ill. 2d 212, 228 (2001).

In *People v. Turner*, 56 Ill. 2d 201 (1973), the court considered the admissibility of a murder confession made by a person who lived at the Polk State School for mentally retarded children from the time he was 8 until he escaped at the age of 18. The court said:

> "This court has long recognized that the mental capacity of a defendant must be taken into consideration in determining whether his actions were voluntary (*People v. Klyczek*, 307 Ill. 150, 155) and while mental deficiency, of itself, does not render a confession involuntary (*People v. Hester*, 39 Ill. 2d 489) it is a factor which must be considered in the totality of the circumstances under which the right to counsel was waived *or a statement or confession made.*" (Emphasis added.) *Turner*, 56 Ill. 2d at 206.

*Turner* cites *Hester* for the proposition that "mental deficiency, of itself, does not render a confession involuntary." This leaves out the accompanying phrase, " 'so long as the subnormality has not deprived the person in question of the capacity to understand the meaning and effect of the confession.' " *People v. Hester*, 39 Ill. 2d at 500, quoting Annot., 69 A.L.R. 2d at 350. The *Turner* court based its suppression of the defendant's confession on its finding that the defendant did not make an intelligent and knowing waiver of his rights and that defendant told the polygraph examiner that he wanted a lawyer before he confessed. *Turner*, 56 Ill. 2d at 207. Consequently, the fact that the *Turner* court left out the additional language from *Hester* does not indicate that the court disagreed with the proposition that, where mental deficiency deprives a person of the capacity to understand the meaning and effect of his or her confession, that confession may be involuntary.

In *People v. Simmons*, 60 Ill. 2d 173, 181 (1975), the court cited the above language in *Turner* in reversing and remanding a trial court's denial of a motion to suppress the confession of a 16-year-old who was "borderline mentally retarded." The court also held:

> "Whether a statement was voluntarily given must be determined from 'the totality of the circumstances' (*People v. Prim*, 53 Ill. 2d 62, 70) and consideration must be given to 'both the characteristics of the accused and the details of the interrogation.' *Schneckloth v.*

*Bustamonte*, 412 U.S. 218, 226, 36 L. Ed. 2d 854, 862, 93 S. Ct. 2041, 2047 [(1973)]." *Simmons*, 60 Ill. 2d at 179.

The court also held that when considering whether a juvenile's confession is admissible, " 'the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.' " *Simmons*, 60 Ill. 2d at 18, quoting *In re Gault*, 387 U.S. 1, 55, 18 L. Ed. 2d 527, 561, 87 S. Ct. 1428, 1458 (1967).

Our supreme court considered this long line of its precedent and the holding in *Connelly* in the seminal case of *People v. Bernasco*, 138 Ill. 2d 349 (1990). In *Bernasco*, the defendant was 17 years old and a psychologist testified that he could not understand *Miranda* warnings. The trial court found that "though the confession was not coerced or otherwise the product of improper police conduct, and though the confession was preceded by *Miranda* warnings [citation], defendant's intelligence level was so low that his *Miranda* waiver and his confession were neither voluntary nor knowing." *Bernasco*, 138 Ill. 2d at 351. In analyzing *Connelly*, the court said:

> "*Connelly* merely means that, in general, issues of intelligent knowledge are separate from issues of voluntariness. The *Connelly* opinion was actually addressing (1) an initial confession given under circumstances requiring no *Miranda* warning (hence involving no question of waiver), the voluntariness of the confession being at issue, and (2) subsequent confessions given after *Miranda* warnings, the voluntariness of the *Miranda* waivers being at issue. Thus—in a narrower vein than that in which the opinion's opening sentences might cursorily be read—the Court continued that, in determining whether a confession is voluntary where there has been no official coercion, inquiries into the state of a confessing defendant's mind, when 'divorced from any coercion *** by the State,' are to be resolved by State evidence law rather than by the due process clause of the fourteenth amendment. (*Connelly*, 479 U.S. at 166-67, 93 L. Ed. 2d at 484, 107 S. Ct. at 522.)." (Emphasis omitted.) *Bernasco*, 138 Ill. 2d at 356.

Significantly, the *Bernasco* court said that the State evidence rules to be applied considered the reliability of the statement, a consideration we will address later. *Bernasco*, 138 Ill. 2d at 353. The court addressed Illinois precedent as follows:

> "Independently of *Miranda* and its Federal voluntariness principles, Illinois courts have long held that, to be admissible, a confession must be 'voluntary' in a State-law sense and that a defendant's mental ability, familiarity with the English language, age, education, and experiences are among factors to be weighed in

determining from the totality of the circumstances *whether a confession* or waiver of rights is 'voluntary' in that sense. (See *People v. Turner*, 56 Ill. 2d at 206; *People v. Hester* (1968), 39 Ill. 2d 489, 497-98; *People v. Cocroft* (1967), 37 Ill. 2d 19, 22; *People v. Earl* (1966), 34 Ill. 2d 11, 15.) (Insanity treated as a categorical exception under Illinois law, the confession of an insane person is involuntary *per se.* (*People v. Lambersky* (1951), 410 Ill. 451, 455; *cf.* 33 Vill. L. Rev. at 903-05 (collecting similar State and pre-*Connelly* Federal holdings).)) In their holdings under State law, Illinois courts in effect have treated intelligent knowledge as one component of a confession's overall voluntariness, rather than as an admissibility criterion separate from voluntariness as in *Miranda* waiver law. (See also Ill. Rev. Stat. 1989, ch. 38, par. 114—11 (governing motions to suppress confessions as involuntary).) The line of *Miranda* cases represented by *Burbine, Connelly, Spring,* and *Patterson* has now seemingly settled, for Federal constitutional purposes, that voluntariness and intelligent knowledge are separate questions; however, *for purposes of our own evidence law they are interrelated."* (Emphasis added.) *Bernasco,* 138 Ill. 2d at 365.

■ The clear import of the above language is that Illinois courts must consider intelligent knowledge as a component of a confession's overall voluntariness independently of *Miranda.* Consequently, courts must consider whether a statement was made with intelligent knowledge even in those instances where *Miranda* does not apply. This proposition is further supported by other language in *Bernasco*: "We now turn to the question whether the manifest weight of the evidence contradicts the trial court's finding that defendant did not waive his *Miranda* rights *or give his confession knowingly and intelligently."* (Emphasis added.) *Bernasco,* 138 Ill. 2d at 367.

Our supreme court addressed the issue of whether a mentally handicapped juvenile's confession was admissible in *In re W.C.*, 167 Ill. 2d 307 (1995). The court stated:

"For a defendant's confession to be admitted at trial, the State must first prove by a preponderance of the evidence that the defendant validly waived his privilege against self-incrimination and his right to counsel. (See *People v. Reid* (1990), 136 Ill. 2d 27, 56.) To be valid, the waiver must reflect an intentional relinquishment or abandonment of a known right or privilege. The accused must possess a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. (See *People v. Bernasco* (1990), 138 Ill. 2d 349, 360 \*\*\*.) To waive rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their

waiver will entail. The mental state that is necessary to validly waive *Miranda* rights involves being cognizant at all times of the State's intention to use one's statements to secure a conviction and of the fact that one can stand mute and request a lawyer. See *Bernasco*, 138 Ill. 2d at 360.

Whether a defendant intelligently waived his right to counsel depends, in each case, on the particular facts and circumstances of that case, including the defendant's background, experience, and conduct. (*Bernasco*, 138 Ill. 2d at 368.) The mental capacity of a defendant must be taken into consideration in determining whether a waiver was valid, and while mental deficiency, of itself, does not render a statement unintelligent, it is nonetheless a factor which must be considered in the totality of the circumstances under which the right to counsel was waived or a statement or confession given. (See *People v. Turner* (1973), 56 Ill. 2d 201, 206.) The greatest care must be taken to assure that a juvenile's incriminating statement was not the product of ignorance of rights or of adolescent fantasy, fright or despair. See *People v. Prude* (1977), 66 Ill. 2d 470, 476 (citing cases)." *In re W.C.*, 167 Ill. 2d at 327-28.

The *W.C.* court's references to a statement being unintelligent and its holding that the mental capacity of a defendant is a factor which must be considered "in the totality of the circumstances under which the right to counsel was waived or a statement or confession given" (*In re W.C.*, 167 Ill. 2d at 328) support the proposition that when a mentally handicapped person makes a statement or confession, the court must not only determine whether the defendant voluntarily waived his constitutional rights, the court must also determine whether the confession or statement itself was voluntary.

Consequently, when the trial court ruled that Braggs' statements to the police were admissible because she was not in custody and *Miranda* was inapplicable, it was in error. Likewise, the court's ruling that, in the absence of police coercion or the defendant being in custody, the fact that Braggs was mentally handicapped was to be considered only as to the weight to be given her statements and not as to whether those statements were inadmissible, was in error. The court should have considered whether Braggs' statement to the detectives was voluntary in a state-law sense based upon the totality of the circumstances. *People v. Bernasco*, 138 Ill. 2d at 356. One of the factors that the court should have considered was whether Braggs' mental retardation deprived her of "the capacity to understand the meaning and effect of the confession." *People v. Hester*, 39 Ill. 2d at 500. This is particularly important in the present case, where the trial court found the defendant was incapable of waiving her rights under *Miranda* due to her diminished mental capacity.

■ As a practical matter, when a court determines that a defendant is capable of knowingly and intelligently waiving his or her constitutional rights, any confession or statement given by that defendant would also probably have been voluntary in that it was made knowingly and intelligently. Conversely, if a person is not capable of waiving his or her rights, his or her mental disability may well deprive him or her of the capacity to understand the meaning and effect of the confession. This is true even in the absence of coercion or police misconduct, such as in the present case. See *In re M.W.*, 314 Ill. App. 3d 64, 71 (2000) (if a *Miranda* waiver is not made intelligently and knowingly, a confession is not voluntary under Illinois law, even though the police satisfied federal constitutional safeguards). Consequently, when a court determines that a defendant is incapable of knowingly and intelligently waiving his or her rights, the court has an additional affirmative duty to determine whether the defendant's statement or confession was given voluntarily.

"Whether a statement is voluntarily given depends upon the totality of the circumstances. The question must be answered on the facts of each case; no single fact is dispositive. Factors to consider when determining voluntariness include: the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the duration of the questioning; and any physical or mental abuse by police, including the existence of threats or promises. *People v. Melock*, 149 Ill. 2d 423, 447-48 (1992); see *People v. Haymer*, 154 Ill. App. 3d 760, 770 (1987) (collecting cases)." *People v. Gilliam*, 172 Ill. 2d 484, 500-01 (1996).

Another factor to consider is the defendant's familiarity with the English language. *People v. Marts*, 266 Ill. App. 3d 531, 539 (1994). Our courts have added additional factors to consider in cases involving juveniles. These same factors are relevant to cases involving defendants who have the mental capacity of children. Perhaps the most important such factor is the presence of a parent or other adult concerned about the defendant's welfare. *People v. Kolakowski*, 319 Ill. App. 3d 200, 213 (2001). The need for close scrutiny of confessions from mentally handicapped persons by all concerned cannot be overstated. In 1967, the Supreme Court addressed its concern in cases involving confessions by juveniles when it held "the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *In re Gault*, 387 U.S. at 55, 18 L. Ed. 2d at 561, 87 S. Ct. at 1458. This heightened concern in reviewing the admissibility of confessions given

by juveniles should also be required in reviewing the admissibility of confessions by the mentally handicapped. As previously discussed, our supreme court has expressed these same concerns, including the possibility that such persons may falsely confess, in an unbroken line of cases since at least 1923. See *People v. Klyczek*, 307 Ill. 150.

In June of this year, the Supreme Court held that executions of mentally retarded criminals were "cruel and unusual punishment" prohibited by the eight amendment. *Atkins v. Virginia*, 536 U.S. 304, 153 L. Ed. 2d 335, 122 S. Ct. 2242 (2002). In so holding, the Court said "some characteristics of mental retardation undermine the strength of the procedural protections that our capital jurisprudence steadfastly guards." *Atkins*, 536 U.S. at 317, 153 L. Ed. 2d at 348, 122 S. Ct. at 2250. One of the bases espoused by the majority was the "reduced capacity" of mentally retarded offenders. As a result of this reduced capacity, mentally retarded defendants may be less able to give meaningful assistance to their counsel; they make poor witnesses and the possibility of false confessions is enhanced. *Atkins*, 536 U.S. at 320-21, 153 L. Ed. 2d at 350, 122 S. Ct. at 2251-52.

The Diagnostic and Statistical Manual of Mental Disorders (4th ed. text rev. 2000) (hereinafter DSM-IV-TR) defines mental retardation as consisting of three features. The essential first feature is a significantly below-average general intellectual functioning as defined by the intelligence quotient (I.Q.). DSM-IV-TR at 41. This is accompanied by significant limitations in adaptive functioning. "Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standard of personal independence expected of someone in this particular age group, sociocultural background, and community setting." DSM-IV-TR at 42. Finally, the onset must occur before the age of 18 years. DSM-IV-TR at 41.

Mental retardation is classified by its degree of severity. The "highest" classification is "mild" mental retardation, and it applies to persons with I.Q. levels of 50 to 55 to approximately 70. DSM-IV-TR at 43. This group constitutes about 85% of those with the disorder. This group used to be referred to as "educable." "By their late teens, they can acquire academic skills up to approximately the sixth-grade level. During their adult years, they usually achieve social and vocational skills adequate for minimum self support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress." DSM-IV-TR at 43.

The second classification is "moderate" mental retardation, and it applies to persons with I.Q. levels of 35 to 40 to 50 to 55. DSM-IV-TR at 42. This group constitutes about 10% of those with the disorder.

This group used to be referred to as "trainable." They are unlikely to progress beyond the second-grade level in academic subjects. DSM-IV-TR at 43. Dr. Pan testified that Braggs belonged in this category.

"Severe" mental retardation applies to person with I.Q. levels of 20 to 25 to 35 to 40. "Profound" mental retardation applies to person with I.Q. levels below 20 to 25. DSM-IV-TR at 42.

Numerous law review articles have recently been written regarding the issues faced by the criminal justice system in dealing with mentally retarded suspects. See M. McCloud, *Words Without Meaning: The Constitution, Confessions and Mentally Retarded Suspects*, 69 U. Chi. L. Rev. 495 Spring (2002) (for a comprehensive listing). In *McCloud*, the authors conducted tests to determine whether mentally retarded persons could understand the *Miranda* warnings. They concluded that, regardless of the level of disability, the mentally retarded subjects did not understand the *Miranda* warnings. Further, this inability was not lessened by the factors of the person's age, education or prior experience with the criminal justice system, including prior administration of the *Miranda* warnings. 69 U. Chi. L. Rev. at 538.

The authors cited several studies which indicated that mentally retarded suspects are more likely to confess to crimes they did not commit than do suspects of average intelligence. 69 U. Chi. L. Rev. at 503. This is true even in the absence of police overreaching. The authors specifically criticize *Colorado v. Connelly*'s exclusive focus upon governmental coercion. The authors assert that for a confession by a mentally retarded person to be admissible, it should be made knowingly and intelligently, and to determine this, courts must look to the "state of mind," the intellectual and psychological capacity, of the person. 69 U. Chi. L. Rev. at 586-87. As previously explained in this opinion, for the last 80 years the Supreme Court of Illinois has required our courts to consider the mental capacity of the defendant as a factor when determining the admissibility of a confession.

Similarly, our supreme court first expressed its concern with the possibility that a person with limited communication skills might falsely confess some 80 years ago. *People v. Klyczek*, 307 Ill. at 155. Clearly, the best evidence to consider in determining whether a confession is false is the credibility of the confession itself. During the discharge hearing in the instant case, Braggs' statement was admitted. In that statement, Braggs said she knocked Rudolph to the floor, where he struck his head. However, Rudolph died of strangulation. When a person of normal intelligence provides false answers to the police, this is considered to be deception and this is treated as evidence of a "consciousness of guilt." *People v. Shaw*, 278 Ill. App. 3d 939, 951

(1996). Based upon our knowledge of the characteristics of the mentally retarded, false answers may well be the result of their desire to provide an answer they believe will please the interviewer.

We note that our legislature has required our courts to consider the reliability of statements made by children or mentally retarded persons before those statements may be admissible as exceptions to the hearsay rule. See 725 ILCS 5/115—10 (West Supp. 2001) (testimony regarding certain out of court statements made by the victim are admissible if: "[(b)](1) [t]he court finds in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient safeguards of reliability; and (2) [t]he child or moderately, severely or profoundly mentally retarded person either: (A) testifies at the proceeding; or (B) is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement"). Similar language is also used in section 115—10.3, entitled "Hearsay exception regarding elder adults." 725 ILCS 5/115—10.3 (West Supp. 2001). These additional safeguards are required to ensure that certain evidence provided by mentally handicapped and child victims is reliable. These same concerns are present in cases involving confessions by mentally handicapped persons. They are also present in cases involving confessions by children, but that issue is not before us.

■ Based on all the above reasons, we reverse the order of the trial court denying Braggs' motion to suppress statements. We remand this matter for a new hearing on the motion to suppress. At that hearing, the trial court must consider the reliability of Braggs' statement and whether the statement was made voluntarily. In making this determination, the court must consider all of the factors set out by our supreme court in *People v. Gilliam*, 172 Ill. 2d at 500-01 (and the cases cited herein). The court must also determine whether Braggs' mental retardation deprived her of the capacity to understand the meaning and effect of her confession. After making this determination, the trial court is to conduct a new discharge hearing pursuant to section 104—25 of the Code of Criminal Procedure of 1963 (725 ILCS 5/104—25 (West 1996)). We note that much of the evidence presented at the motion to suppress hearing was unavailable to the court which conducted the 1996 discharge hearing.

Reversed and remanded with instructions.

CAMPBELL, P.J., and GREIMAN, J., concur.