Patrick Dwayne MURPHY, Petitioner,

v.

STATE of Oklahoma, Respondent.

No. PCD–2001–1197.

Court of Criminal Appeals of Oklahoma.

March 21, 2003.

Bryan Lester Dupler, Oklahoma Indigent Defense System, Norman, OK, for petitioner on appeal.

W.A. Drew Edmondson, Attorney General, David Brockman, Assistant Attorney General, Oklahoma City, OK, for respondent on appeal.

## OPINION DENYING APPLICATION FOR POST–CONVICTION RELIEF REGARDING MENTAL RETARDATION AFTER REMAND FOR EVIDENTIARY HEARING

LUMPKIN, Judge:

¶1 Petitioner, Patrick Dwayne Murphy, was convicted of First Degree Murder in the District Court of McIntosh County, Case Number CF–1999–164A, and sentenced to death. He appealed his conviction to this Court in Case No. D–2000–705. We affirmed Petitioner's conviction and sentence in *Murphy v. State*, 2002 OK CR 24, 47 P.3d 876.

¶2 Petitioner filed his Application for Post–Conviction Relief on February 7, 2002, claiming that, due to his "mild mental retardation," his execution would violate the state and federal constitutional prohibitions against cruel and/or unusual punishments and would offend contemporary standards of decency. Petitioner's claim proved to be the test case for how this Court would proceed on the issue of mental retardation, following the United States Supreme Court's landmark decision in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

¶3 In light of *Atkins*, we found merit in Petitioner's mental retardation claim, raised in proposition three of his post-conviction application, to such an extent that required further attention. *See Murphy v. State*, 2002 OK CR 32, 54 P.3d 556.[1] We therefore remanded the case to the District Court of McIntosh County for an evidentiary hearing "on the sole issue of Petitioner's claim of mental retardation." The District Court was ordered to "determine if Petitioner has raised sufficient evidence (at trial, on appeal, or at the evidentiary hearing) of his mental retardation, in accordance with the definition set forth herein, for the issue of mental retardation to be decided as a fact question by a jury at a resentencing hearing." We defined "sufficient evidence" as "enough evidence to create a fact question on the issue of whether the Petitioner is mentally retarded, as herein defined." We then instructed the District Court to submit its written findings to this Court.

¶4 Before delving into the trial court's findings, we must point out that this case is unique, as most future cases will raise the issue of mental retardation in direct appeal proceedings. Our opinion on the issue of mental retardation, as set forth in *Murphy v. State*, 2002 OK CR 32, 54 P.3d 556, will not always be an easy fit, for it was this Court's well-intentioned attempt to give guidance and instruction for all cases involving the issue of mental retardation, as best we could. The opinion sets forth our position that all defendants should be given a fair opportunity to present the issue of mental retardation, and, where sufficient evidence of mental retardation has been demonstrated, that issue must be decided by a jury.

¶5 At Petitioner's jury trial, Dr. Bill Sharp, a licensed psychologist, testified that he had been able to visit with Petitioner for two hours, while Petitioner was in handcuffs. During the first stage of trial, Sharp testified that Petitioner "has probably a borderline mental capacity" (i.e., an I.Q. of about 70 to 79), but Sharp's testimony primarily concentrated on Petitioner's chronic alcoholism and blackouts. During the second stage, however, Sharp testified that Petitioner scored a 67 on an abbreviated form of the Wechsler Adult Intelligence Test, which is in the mildly mentally retarded range.

¶6 Nevertheless, in his testimony and written report, Sharp indicated his belief that Petitioner would ultimately fall in the low average (i.e., an I.Q. of about 80 to 89) to borderline range and that test results may have been affected by cultural concerns, Petitioner's impulsivity, and the testing conditions.

¶7 At trial, Petitioner received the benefit of a jury instruction telling jurors to consider, as a mitigating factor, that he suffers from mild mental retardation. Jurors were thus given the opportunity to consider all the evidence Petitioner had presented regarding his claim of mental retardation and then to decide whether or not that factor, along with other matters of mitigation, should spare his

---

1. We denied post-conviction relief on all other     issues except proposition three.

life. The jury elected to assess the death penalty.[2]

¶ 8 In a way, the issue here is a simpler one. The sole question is whether or not Petitioner has raised sufficient evidence to create a fact question on the issue of his claim of mental retardation. If so, the issue must be submitted to a jury to be decided at a hearing, held solely on the issue of mental retardation, as we have defined it.

¶ 9 The trial judge, the Honorable Steven W. Taylor, having heard all the evidence at trial and at the remanded evidentiary hearing answered this question with a resounding no. It is absolutely clear from Judge Taylor's order that he does not consider Petitioner to be mentally retarded under this Court's definition and the evidence presented. Judge Taylor is strongly of the opinion that a further hearing in this case would be futile.

¶ 10 Among other things, Judge Taylor found: Petitioner's alcoholism directly impacted the 67 I.Q. finding made by Dr. Sharp in the partial and incomplete test given at the McIntosh County jail; the test administered by Dr. Sharp is not reliable due to the jail conditions, the incomplete testing, recent alcohol use, and lack of confidence in the test expressed by Dr. Sharp; a later complete I.Q. test which was given to the Defendant demonstrated an I.Q. of 80; the elementary school testing did not demonstrate mental retardation, only some academic weakness; in reference to the definition of mental retardation in the Remand Order, the evidence does not fit into any of the three categories; and there is a total lack of reliable evidence of mental retardation in this case.

¶ 11 While the determinative issue is, perhaps, a close one, most of Judge Taylor's findings are fairly supported by the record, and his ultimate conclusion, that Petitioner had not raised sufficient evidence to create a fact question on the issue of mental retardation, is not clearly erroneous.

¶ 12 We agree with Petitioner that the question of "sufficient evidence" is essentially the legal equivalent of a defendant making a *prima facie* showing of mental retardation with his or her evidence. *Prima facie* evidence has been defined as "[e]vidence good and sufficient on its face; such evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient." *Davis v. State*, 1975 OK CR 211, 541 P.2d 1352, 1354; *see also Bland v. State*, 2000 OK CR 11, 4 P.3d 702, 719–20. However, that *prima facie* evidence must include all prongs of the definition for mental retardation.

¶ 13 In *Murphy*, we defined mental retardation by dividing it into three separate prongs, as follows:

A person is "mentally retarded": (1) If he or she functions at a significantly subaverage intellectual level that substantially limits his or her ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others; (2) The mental retardation manifested itself before the age of eighteen (18);[3] and (3) The mental retardation is

---

2. Mental retardation was not raised as an issue in Petitioner's initial appeal. (It appears Petitioner's appellate attorneys were more concerned with his trial attorney's failure to present thorough expert testimony regarding Petitioner's alleged neuropsychological dysfunction due to chronic alcoholism and prior head injuries.) The issue of retardation was raised, however, in Petitioner's application for post-conviction relief. As noted above, we remanded the matter for an evidentiary hearing, and Petitioner was given a second opportunity to present any evidence he had concerning his claim of mental retardation, in light of *Atkins* and this Court's definition of mental retardation. *Murphy*, 2002 OK CR 32, 54 P.3d 556.

3. "Manifestation before the age of eighteen" is a fact question intended to establish that the first signs of mental retardation appeared and were recognized before the defendant turned eighteen. Lay opinion and poor school records may be considered. Thus, a defendant need not, necessarily, introduce an intelligent quotient test administered before the age of eighteen or a medical opinion given before the age of eighteen in order to prove his or her mental retardation manifested before the age of eighteen, although such proof would surely be the more credible of that fact.

accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work.

A defendant must satisfy each of these prongs in order to be considered mentally retarded for purposes of his or her ineligibility for the death penalty.

¶ 14 With respect to the first prong, the record clearly indicates Petitioner's intelligence does not *substantially* limit his ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses and to understand the reaction of others. Furthermore, with respect to the third prong, the record clearly indicates Petitioner does not have *significant* limitations in adaptive functioning in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work. As stated in the DSM–IV: Mental Retardation, "adaptive functioning" means "the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group." [4]

¶ 15 While Petitioner has some weaknesses in controlling impulses and logical reasoning, the record does not indicate his intelligence is substantially limited, separate and apart from his excessive alcohol consumption. Furthermore, Petitioner's adaptive functioning appears fairly normal, in spite of his excessive alcohol consumption.

¶ 16 Petitioner's own expert questioned the validity of the 67 Petitioner scored on the abbreviated form of the Wechsler Scale of Intelligence, ultimately finding Petitioner was in the borderline range.[5] Sharp had been hired by Petitioner's lawyers to look for signs and symptoms of chemical dependency and the addictive process; his focus was not mental retardation. Testing took place at the county jail, and Petitioner remained in shackles and handcuffs during the brief two-hour testing. Petitioner was "hyper" during the testing with a lot of excess motor movement. Testing occurred seven months after Petitioner was arrested, and testimony indicated cognitive deficits from alcohol could stay with a person from six months to over a year. Indeed, Sharp thought Petitioner's restlessness was a sign that he was still affected by his earlier alcohol abuse. Sharp attributed Petitioner's more recent IQ score of 80 to the following: "I think he's continued to improve because he's been further away from having alcohol."

¶ 17 Sharp gave Petitioner the Wechsler Abbreviated Scale of Intelligence, which had two subscales instead of the four on the full-scale version of the test. Sharp did not do adaptive behavior rating scales in order to make a diagnosis of mildly mentally retarded. There were longer, more comprehensive, tests that could have been conducted, but Sharp's focus was on alcohol dependency, not intelligence. He generally agreed Petitioner would have performed better if given all the subtests of the Wechsler test.

¶ 18 Sharp noted Petitioner demonstrated good social skills and was extremely cooperative during testing. Further, Petitioner graduated from high school without ever being held back and then attended some college classes. He has a good work history and received praise from his employers and was promoted to being a supervisor at his last job. He was neat and appropriate in appearance and had no noticeable speech problems. His thought processes "seemed to be logical and coherent." His judgment was estimated to be fair to poor.

¶ 19 Simply stated, Dr. Sharp's testing does not establish evidence good and sufficient on its face to establish mental retardation, as defined, even without rebuttal or contradiction. His conclusion that Petitioner functions in the borderline range of intelligence was confirmed by testing performed by Dr. Faust Bianco, who described Petitioner as follows: amiable; well groomed; ori-

---

4. Diagnostic and Statistical Manual of Mental Disorders, Fourth Ed. (1994).

5. This estimate is corroborated by the 80 Petitioner scored on a more recent test, a full-scale version of the Wechsler Scale of Intelligence.

ented in all spheres; good insight and awareness; clear and fluent speech; able to comprehend what he reads; able to write legible sentences; polite; good sense of humor; 1.5 years of college education; normal gross mental status; "[a]lthough his gross cognitive functioning was borderline in nature he was not judged to be formally cognitively challenged (mentally retarded);" average short term retention of verbal material; low average visual attention skills; average perception; low average memory and language skills; and full I.Q. of 80.

¶ 20 Judge Taylor also found "mental retardation" did not manifest itself in the Defendant before age eighteen. His learning limitations, however, certainly did. He scored weak to extremely weak in many areas of the Wechsler Preschool and Primary Intelligence Scale for Children, given before he turned six. He was placed in classes for the educable mentally handicapped, a term no longer used but was said to be comparable to mildly mentally retarded. He scored a grand mean of 5.48 on the test, which indicated a score between 65 and 73 in intellectual functioning, a range that would now be either mildly mentally retarded or borderline.

¶ 21 On the other hand, severe auditory problems were noted in the school reports, as well as low frustration tolerance and anxiety. Petitioner was never held back in school. He was able to adapt and function and improve his skills over time. There was no formal diagnosis of mildly mentally retarded.

¶ 22 Valid test scores, standing alone, might have been sufficient to raise a fact question as to the second prong of the Murphy definition of mental retardation. However, as has been noted by subsequent testing, Petitioner's scores have been determined more by external influences than intellectual ability, i.e., auditory problems, low frustration tolerance and anxiety, and alcoholism. Because Petitioner did not present sufficient evidence to satisfy the first and third prongs, and subsequent validated testing has shown

he is not within the range of mental retardation, there is not sufficient evidence as to any of the prongs and the fact that his learning limitations manifested before the age of eighteen is a moot point.

¶ 23 We do note, however, that certain arguments presented to Judge Taylor during the evidentiary hearing make it readily apparent Petitioner is attempting to expand the definition of mental retardation to include that which is a result of alcoholism. We reject this argument wholeheartedly, finding it inconsistent with both *Atkins* and *Murphy.*

¶ 24 As both cases clearly explain, mental retardation is a developmental condition[6] that manifests before the age of eighteen, or, as the American Association on Mental Retardation puts it, one that appears "at birth or during the person's childhood."[7] Mental retardation is not an after-acquired disability that arises from a person's lifestyle choices, but one that originates from birth. As Professor James E. Ellis from the University of New Mexico School of Law explains, "The purpose of this ... prong of the definition is to distinguish mental retardation from those forms of brain damage that may occur later in life. (Such later-developing mental impairment could result from causes such as traumatic head injury, dementia caused by disease, or similar conditions.)" Ellis, *Mental Retardation and the Death Penalty: A Guide to State Legislative Issues,* pg. 9 (2002).

¶ 25 While the literature indicates the disability manifests "during the developmental period," legislatures, and now the Supreme Court, have extended the manifestation to prior to the 18th birthday. This elongated period of discovery gives the benefit of proof to the charged offender, although in most circumstances the condition will begin manifesting early in a child's learning cycle by slow development, inability to retain, and a limited ability (or no ability) to read and function within the person's age group. In-

---

**6.** "Mental retardation is not a psychological or medical disorder; it is a permanent developmental or functional condition." Lyn Entzeroth, *Putting the Mentally Retarded Criminal Defendant to Death: Charting the Development of a National* *Consensus to Exempt the Mentally Retarded from the Death Penalty,* 52 Ala.L.Rev. 911, 915–16 (2001).

**7.** See also DSM–IV, *supra,* note 4.

deed, persons with mild mental retardation can attain academic skills only up to a sixth grade level.[8]

¶ 26 In this case, Petitioner's counsel presented evidence and argument that attempted to show Petitioner was suffering from "mental retardation" as a result of alcoholism. While alcoholism, and its effects, might be described as a disability, alcoholism is not a cause of mental retardation or even a factor in the mental retardation equation. Indeed, Petitioner's alcoholism, in a sense, has an opposite effect, by muddying the ability to measure a defendant's retardation. In the instant case, Petitioner's alcoholism brings his testing with Dr. Sharp into serious question, insofar as any conclusions regarding mental retardation are concerned, because the effects of alcoholism likely impacted Petitioner's test-taking abilities, as Sharp himself admitted. We simply must separate one from the other in order to resolve the issue of mental retardation.

¶ 27 In other words, mental retardation is a cognitive disability originating as a part of the human makeup of the subject individual. That is why the U.S. Supreme Court, in *Atkins,* elevated the condition beyond a mere mitigating factor to one that disqualifies defendants from eligibility for the death penalty.

¶ 28 The Supreme Court of Alabama recently addressed this issue in a factually similar case relating to the proof of mental retardation. In *Ex Parte Roy Edward Perkins v. State of Alabama,* —— So.2d ——, 2002 WL 31630711 (Ala.2002) (rehearing pending, not yet released for publication), the Court found that, while the evidence-which included a defendant who had a full scale I.Q. of 76, who had earned a GED certificate, who had completed a college course in prison, and whose intellectual functioning had probably declined because of alcohol abuse—presented a "strong mitigating circumstance to be considered in determining the appropriate sentence," it was not sufficient to establish the common requirements for mental retardation.

¶ 29 The same is true here. The bottom line is that Appellant's adaptive functioning, including schooling and work history, and his 80 I.Q.—calculated with retardation in mind, with complete testing, and at a time when alcoholism should have had no impact on testing—all demonstrate Petitioner is not mentally retarded. Accordingly, we find the trial court's findings are not clearly erroneous, and no resentencing hearing is required. Petitioner's death sentence is thus **AFFIRMED,** and his Application for Post–Conviction Relief is hereby **DENIED.**

LILE, V.P.J., concurs.

JOHNSON, P.J., specially concurs.

CHAPEL and STRUBHAR, JJ., dissent.

JOHNSON, P.J., SPECIALLY CONCURRING.

¶ 1 I specially concur in the majority opinion herein. I do wish to state that I have not changed my position from earlier writings as it relates to the procedure. I, along with Judge Chapel, would adopt a different procedure as previously recorded in this case.

¶ 2 If a petitioner establishes a *prima facie* case in any of the three prongs set forth in the definition of mental retardation, then he or she should be allowed to present that evidence to a jury to decide the issue. In this case, there is a clear ruling from an excellent trial judge that there was evidence of possible mental retardation. However, the judge made the determination that that was due to previous alcohol problems, and when the alcohol was removed, so was the mental retardation possibility.

¶ 3 I do wish to be clear that under the facts of this case, the judge made a proper ruling. However, under subsequent cases, if there is a *prima facie* showing of evidence of possible mental retardation under any of the three prongs, then a jury issue is established.

CHAPEL, J., DISSENTING.

¶ 1 We remanded this case to the trial court for an evidentiary hearing on the is-

---

8. DSM–IV, *supra* note 4; *People v. Braggs,* 335 Ill.App.3d, 52, 268 Ill.Dec. 861, 779 N.E.2d 475,

488 (Ill.App. 1 Dist.2002); *see also* Entzeroth, *supra* note 6, 52 Ala.L.Rev. at 914.

sue of mental retardation. We specifically directed the trial court to determine whether Murphy had raised enough evidence to create a fact question on the issue of whether he was mentally retarded, as defined in our opinion on remand. That definition contained three categories: (1) subaverage intellectual functioning which significantly limits a person's ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses and to understand others' reactions; (2) manifestation before age 18; and (3) significant limitations in adaptive functioning in at least two of nine enumerated skill areas; in addition, a person must have an intelligence quotient of seventy or below.[1] I agree with the majority that Murphy must make a *prima facie* showing of mental retardation before this becomes a jury issue. However, I disagree with the majority's conclusion that a defendant must present *prima facie* evidence of all three categories of mental retardation in an evidentiary hearing. I believe that, where a defendant makes a *prima facie* case that he is retarded in even one category using the *Murphy* definition, a jury ought to determine the issue. The majority here admits that Murphy presented sufficient evidence to raise a fact question regarding the second *Murphy* category. I would remand the case for a jury determination of the issue of mental retardation.[2] I dissent.

STRUBHAR, J., DISSENTING.

¶ 1 I dissent as the evidence presented to the trial court was sufficient to submit the question of mental retardation to a jury.

---

1. *Murphy v. State*, 2002 OK CR 32, 54 P.3d 556, 566–67.

2. Throughout, the majority refers to the "clearly erroneous" standard of review for the trial court's findings. As the *Murphy* definition requires a defendant to make a *prima facie* case for mental retardation only by a preponderance of the evidence, the "clearly erroneous" standard would not be appropriate. I think these cases require a *de novo* review, and the majority discussion of the findings suggests that it performed a *de novo* review in reaching its conclusion.